## THE GREAT REPUBLIC.

1. In cases of collision, where there is a great conflict of testimony, the court must be governed chiefly by undeniable and leading facts, if such exist in the case. The court so governed in this case.

2. A pilot, when he is close to a vessel before him making movements which are not intelligible to him, ought not, in a case which is in the least critical, to be governed by his "impressions" of what the vessel is going to do. He should make and exchange signals, and ascertain positively her purposed movements and manœuvres.

3. A steamer close to the right bank of a broad river—one, *ex. gr.*, a half a mile broad—which means to cross over and land on the left shore, is not bound, in the first instance, to give *three or more* whistles, which is the signal for landing. It is enough that she give *two* whistles, which is the signal that she is going to the left. The three or more whistles may be given later.

4. Constructions not favorable put on the testimony and manœuvres of a pilot who, it was proved, was "addicted to drinking when ashore," and who confessed to having been drinking on the day when his vessel left port, and within an hour of which time a collision occurred; though he swore that he had not taken any drink for six hours before his boat left its dock.

5. Similar constructions put on the conduct of a captain whose watch it was, but who, instead of being engaged in a proper place in superintending the navigation of his vessel, was on the lower deck conversing with a passenger.

6. A large and fast-sailing steamer is bound to act cautiously when overtaking and getting near to a small and slow one; and a collision having occurred between two steamers of this sort, a minor fault of the small and slow steamer was held not to make a case for division of damages where such fault bore but a little proportion to many faults of the large and fast one.

7. When, in a case of collision, it appears that one of the vessels neglected the usual and proper measures of precaution, the burden is on her to show that the collision did not occur through her neglect.

APPEAL from a decree of the Circuit Court for the District of Louisiana, which court, on appeal from the District Court sitting in admiralty, had dismissed a libel filed by the steamer Cleona against the steamer Great Republic, for a collision.

The case was thus:

At about five o'clock on the afternoon of the 28th of

August, 1869, the Cleona, a small stern-wheel steamer of one hundred and eighteen tons, and whose speed was about seven miles an hour, left New Orleans bound up the Mississippi to Donaldsonville (a place seventy-five miles above New Orleans), with an assorted cargo of merchandise for various plantations on the two banks of the river. In a little more than half an hour afterwards the steamer Great Republic, a heavy side-wheel vessel of two thousand two hundred tons, running at the rate of twelve or fourteen miles an hour, and therefore one of the fastest on the Mississippi, set off up the river bound on a voyage to St. Louis. The Cleona, as she went up the river, had been, all the time, and was now, in her full view.

Sailing up the stream the Cleona had now twice made landings; first at what is known as the Stock-wharf, in the upper part of New Orleans, and afterwards at a point known as the Nine-mile Point, a point above the city on the opposite or western bank of the river.

Having made this second landing she steered for the other or eastern bank—the stream being in all this part of it about half a mile wide—and then after straightening up and running for some time parallel with the eastern bank and within about forty-five yards of it—turned somewhat shortly to cross to a place called Waggaman's Landing, on the western side, at which she wanted to discharge a part of her cargo. She was now perhaps two miles above the Nine-mile Point.

The Republic, from the time that she began to overtake the Cleona, had followed much in her course—this line perhaps being the one indicated more or less by the channel—and was so following when the Cleona steered from the Nine-mile Point to the eastern bank. Of course the Republic was rapidly gaining on the Cleona, and if no catastrophe had occurred, would have passed her.

By the rules of navigation on the Mississippi one whistle from the steam pipe indicates that a steamer wishes to pass on the starboard or right side; two, that she wishes to pass on the larboard or left, and three or more, that she is going to cross and land.

How far the Republic was behind the Cleona when the latter turned from the eastern bank to cross to Waggaman's Landing, was a matter about which the testimony was widely discrepant; the witnesses in behalf of the Cleona asserting that it was from six hundred to seven hundred and fifty yards, while those of the Republic fixed it, some of them, so low as forty yards, while all brought it within three hundred.

The river, as already said, was in this part of it a half a mile wide. There were no obstructions in it. Dusk was supervening, but it was not dark; objects being visible to both vessels, alike on the shores and on each other.

When the Cleona turned to cross from the eastern bank to Waggaman's Landing, the captain of the Republic, whose watch it was, was on the lower deck of the steamer conversing with a passenger. The passenger saw the Cleona turning, and said to the captain, "Why, she is taking a sheer." The pilot of the Republic was of the same impression. Instead, therefore, of keeping his own course, he followed the Cleona's. He perceived, however, before very long his mistake, as did all on both vessels very soon that a catastrophe was impending.

What signals were given in this state of things was, as usual in cases of collision, a matter where the evidence conflicted. But the result of the conjoint courses of the two vessels, and action on board of them—that is to say, on the one hand, of the Cleona's turning short to cross when the Republic was so near behind, and on the other, of the Republic's supposing that the Cleona still meant to go up the river, and attempting to follow her—and either of improper signals or inattention to right signals on one or other of the vessels, or on both—was a collision, by which the Cleona was careened, her stern end cut off, and two persons thrown off her into the river and drowned; a catastrophe the more deplorable since the evidence made it plain that if the boats had had fifteen seconds more time—if one of them had been ten feet further on, or the other ten feet further off—all misfortune would have been avoided; and that even five feet

in the change of their positions would have prevented any serious injury.

We have already said that the testimony was discrepant.

The pilot of the Republic testified thus:

"When I arrived below the Twelve-mile Point I saw the Cleona sheer to the larboard. She gave no signal *when* she thus started. *After* she had been running out about half a minute she gave the signal—two blasts of her steam whistle, which were given just as fast as a man can blow them on a steamboat—and continued her course out. As soon as I saw her sheer to the larboard, I, too, pulled to the larboard and was so swung —all helm—thinking that she was running off from the shore. When she started off to the larboard, I was below her in the current from two hundred and fifty to three hundred yards, and to the larboard of her about the same distance. Immediately after she sheered I pulled my boat, as I have said, to the larboard, rang, first, both stopping-bells, and then the backing-bells. I then told the boat's clerk who was in the pilot-house at the time, to halloo through the trumpet on the larboard to the engineer to 'back *hard*.' I hallooed the same thing through the starboard trumpet. The engineer on that side hallooed to me that the boat was backing as hard as she could. *I cannot say how long the Republic had been backing when she struck the Cleona.* The Republic being a low-pressure boat, it is impossible for the pilot to tell when she is backing until he feels the vibration of the wheels. It was, I suppose, about half a minute from the time the backing bells were rung until the collision occurred; not over half a minute. From the vibration of the boat, I was certain that the Republic was backing before she struck the Cleona."

The engineer of the Republic testified thus:

"The bells on both sides were rung to stop both engines. The engines were stopped immediately. Then the check bells, one on each side. This was a notice to us to prepare to back. The engines were checked immediately. Then the backing bells rang on both sides. Both engines backed immediately. No time was lost in obeying these orders. My assistants were very good assistants, and handled the engines very well.

"I did not see the collision nor feel the jar of it. I knew

nothing of it until some time after it had occurred. I therefore don't know how far the Republic was from the Cleona at the time the bells were rung, nor what length of time elapsed between the first ringing of the bells and the collision; *but we were alongside of the Cleona before the larboard engine was stopped. I saw her from the engine-room. The Great Republic, if going up stream at twelve or fourteen miles an hour, can be stopped dead in seventy-five yards.* We can stop her in this way because she is a low-pressure boat."

Witnesses, including the pilot from the Cleona, testified, on the other hand, that as the Cleona's head was directed across the stream, one blast of the whistle was blown as an indication for the Republic to keep to the right, which, had she done it, would have prevented all injury; that the Republic not minding that signal, the signal was repeated in about one minute and a half afterwards; that the Republic neither answered nor obeyed the signals, but kept running on; that the pilot of the Cleona seeing a collision impending, and one which, if the two vessels kept their then courses, would cut the Cleona in two, ordered on all head of steam and headed his vessel down stream, so as that the blow, if inevitable, might cut her wheel off, or cut off only an edge of her stern; that by this manœuvre the injurious effect of the collision was mitigated; that, notwithstanding this, the Republic came upon the stern extremity of the Cleona with tremendous force, causing her to turn partially over, and throwing, as already stated, two persons overboard, who were drowned, and wholly disabling the Cleona, whose surviving passengers sought safety on the Republic.

A witness who had been a passenger on the Republic also testified to the bad action of her pilot, and to other unfavorable matters. He said:

" I am a pilot by profession, and have been for sixteen years. When the Cleona swung round to cross, Mr. Fulkerson, one of the pilots of the Republic (not at the time in charge of the wheel), with whom I was conversing, said: 'Look at that fellow. What is he going to do?' I replied, 'I suppose that he is going over the river to land.' I think that it was prudent for the

Cleona to have attempted to cross the river where she did if she had business on the other side. She was then from three hundred to five hundred yards ahead of us. I do not think that at that time the Republic could have passed between the Cleona and the shore. The Cleona blew two whistles; two *distinct* blowings. Had not the Republic changed her course there would have been no collision. A little before the collision, and when the Republic was about one hundred yards from the Cleona, Mr. Fulkerson remarked to me that if his partner (that is to say, the pilot then in charge of the wheel) did not stop the Republic, she would be into the Cleona. I do not know whether her wheels were stopped at all before the blow. The Republic gave no signal. Properly it was her duty to give the first signal, stating which side she would take, as she was gaining on the Cleona."

Testimony was brought in behalf of the Cleona to show that, when "ashore," the pilot of the Republic was addicted to drinking spirituous liquor, and had been drunk on shore, though the witness " had never seen him at the wheel in an intoxicated state."

The pilot himself, on cross-examination, said:

" I sometimes drink spirituous liquors. I took none for six hours before the Republic left port on that day. I could not say how many drinks I took. I did not keep any account of them."

The court below (herein affirming the decree of the District Court) considered that the Cleona had crossed the river without proper signalling, too much under the bow of the Republic, and in the current, and that this was the cause of the disaster.

Its view was thus expressed:

" The act of crossing the bow of a boat when in close proximity is forbidden by the rules of navigation, and is a most dangerous and reprehensible action at any time. No prudent pilot will attempt it. In the case of the Cleona, it was doubly dangerous, as the Republic was gaining on her so rapidly that a collision was probable, especially as the weight of proof seems to show that the signal of the Cleona was two blows of her

whistle, which signal the pilot of the Republic was bound to interpret as an order to pass to the larboard, which he did.

"When the Cleona first started out from the shore she gave no signal to indicate her course, as she ought to have done; and when, in response to the two blows of the Cleona, the Republic pulled to the larboard, prudence should have dictated to the pilot of the Cleona to have stopped his boat at once and to have backed her heavily, instead of ringing his bell to crack on all steam and cross at all hazards. The pilot of the Republic was indeed guilty of a deviation from the rules and observances of navigation in not answering the signal of the Cleona; and though he acted promptly in letting his boat fall off to the larboard, he ought, in strict duty, to have answered the signal; but this omission had nothing to do with the collision, for his course was fully observed by apparently all on board the Cleona, and the pilot of the Cleona, if he thought that there was a misconstruction of his signal, should at once have stopped his engines and reversed. If this had been done a collision would not have taken place."

From a decree of dismissal of the libel, made on this view, the present appeal was taken.

By the act of Congress of April 29th, 1864, entitled "An act fixing certain rules and regulations for preventing collisions on the water,"* it is enacted:

"ARTICLE 16. Every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.

"ARTICLE 17. Every vessel overtaking any other vessel, shall keep out of the way of the said last-mentioned vessel."

*Messrs. William Tod Otto and J. A. Grow, for the appellants:*

The Republic was in fault in five particulars:

1st. In not keeping her course, instead of bearing to the left, and following the steamer Cleona until she ran into that boat.

2d. In not stopping her own engines and checking her speed in proper time.

---

* 13 Stat. at Large, 61.

3d. In not altering her course to the starboard by porting her helm, when the collision became inevitable from the course she was pursuing.

4th. In not giving any signal, and in failing and neglecting to answer the signals given by the steamer Cleona.

5th. In her captain, whose watch it was, not having been on watch and control of the navigation of the vessel at the time of the collision; he having been sitting on the lower deck talking to a passenger, instead of being on the roof of the boat, and seeing and superintending her navigation.

*Messrs. Durant and Hornor, contra:*

The Cleona, whilst ascending the left bank, suddenly, without warning or signalling, changed her course to crossing the river, at a wrong place, not more than three hundred yards ahead of the Republic, *in the current.* The Republic thought she had sheered, and helmed astarboard to give her room to straighten up, but she kept on across, to the pilot's surprise, and gave two whistles and kept on crossing. Then danger became imminent. Then the Republic helmed hard astarboard; first, stopping-bells; then, backing-bells; and had begun to swing heavily to the larboard; but it was not possible to at once overcome momentum or suddenly change the course of the Republic.

I. Admitting the right of the Cleona to cross the river when and where she pleased, still that vessel was in fault in exercising this right, under the circumstances; because it could not be done without the greatest peril to the Cleona herself, and without equal danger to the far more valuable Republic and her freight, and her much larger crew and number of passengers. It is fault for a pilot to persist in the exercise of an undoubted right, when, by refraining from its exercise, damages can be avoided.*

This persistent act of folly on the part of the Cleona in crossing in front of the Republic was the beginning, continuance, and end of the disaster.

* Mayhew *v.* Boyce, 1 Starkie Reports, 343.

II. Nor was it fault in the Republic not to answer the Cleona's signals. Because—

1st. They were not the proper signals for a crossing boat.

2d. They were ambiguous signals, and the Republic could not know whether they were intended to direct her to the starboard or to the larboard.

3d. They were in every way calculated to mislead, and should not have been answered.

4th. They were susceptible of three different interpretations; and an answer, even if responsive to the views and intentions of those on the Cleona, would have been useless and unprofitable.

III. The fault was not on the Republic for not replying to the Cleona's signals, but on the Cleona, for having made signals which were no indication of her intention to cross; but which, according to her own account, were given for a different purpose, and so hurriedly, imperfectly, and tardily that any intelligent response to them was impracticable; signals which, if they had been acted upon by the Republic, would in all probability have been followed by a result even more disastrous than the one which took place. This is true at least of her alleged signalling to helm astarboard.

The intemperance of the Republic's pilot has not been proved. There are few seamen who, when ashore, do not occasionally drink strong drink, and sometimes too much of it. Yet those same men, when on duty, or liable to be put on duty, will never touch it. The pilot here had touched nothing intoxicating for seven hours before the catastrophe.

On the whole case, see the *Grace Girdler*.*

Mr. Justice DAVIS delivered the opinion of the court.

There is some excuse, even for a party in fault, when two boats collide in tempestuous or foggy weather, or on a dark night, but there are no exculpatory circumstances attending this disaster. It happened before dark, in the middle of the Mississippi, and when the light was good enough to distin-

---

* 7 Wallace, 196.

guish small objects on both banks of the river. The weather was clear and calm, and the river unobstructed, affording ample room for passage on either side of the point where the vessels collided.

It is very plain that the collision ought to have been avoided, and the inquiry is, who is to blame for it. It almost uniformly happens in cases of this description that different accounts are given of the occurrence by those in the employment of the respective vessels, and that the court has difficulty in this conflict of evidence of deciding to which side a preferable credence should be given. There are generally, however, in every case, some undeniable facts which enable the court to determine where the blame lies, and this case is one of that character.

There is no dispute that the Cleona was a small stern-wheel boat of the burden of 118 tons, that the steamboat Great Republic was of the burden of 2200 tons; a large and very fast vessel with side wheels; that both boats crossed the river, from the right to the left bank, just above Nine-mile Point, and straightened up on the left bank and ran parallel with the shore for some time, the Cleona being some distance ahead, and the Republic following almost in her wake; that just previous to reaching Twelve-mile Point the Cleona started to cross the river in an oblique direction, intending to make a landing at Waggaman's plantation to put out freight; that the Republic kept bearing to the left, following the Cleona, instead of keeping her course, and finally overtook her about the middle of the river, and that the collision occurred. There is a great deal of discrepancy in the testimony relative to the distance between the two boats at the time the Cleona started to cross for the Waggaman plantation. Under the most favorable circumstances it is impossible to measure distances on the water with accuracy, but in times of excitement there is very little reliance to be placed on the opinion of any one on this subject, and especially is this so when the condemnation of a boat may depend upon it. If the Cleona was only some two or even three hundred yards ahead of the Republic, it was cer-

tainly imprudent in her officers to undertake to cross the river, but if she was more than double this distance in advance there is no reason why she should not have attempted to cross if she had business on the opposite side.

Without discussing the testimony to show on which side the probabilities are, there are certain things in connection with this part of the case which are inconsistent with the theory advanced by the respondents. According to the testimony of nearly all the witnesses the Republic was going twice as fast as the Cleona, or, in other words, making two hundred yards to the Cleona's one hundred. It is quite clear that the Cleona was not more than forty or fifty yards from the left shore when she turned to cross over, and must have sailed to reach the middle of the river (a half mile wide at that point and confessedly the place of collision) nearly, if not quite, four hundred yards, and occupied, at her rate of speed, at least two minutes of time in doing it. As the Republic was swinging to the larboard, which would increase her distance outside of the Cleona, she must have gone considerably over eight hundred yards to reach the point of collision. Besides, if the distance between the two boats when the Cleona undertook to cross was as short as the respondents say, the collision would have occurred much sooner, as the speed of the Republic, by the weight of the testimony, was twelve miles an hour, enabling her to make three hundred and fifty yards in one minute. It would, therefore, seem quite clear that the Cleona was far enough ahead to cross with safety, on the supposition that the following boat would pursue the prescribed rules of navigation. Apart from this view of the subject the Republic cannot escape condemnation if the case be tested by the account which the pilot at the wheel gives of the affair. He says that he thought when the Cleona turned to the larboard she was sheering—running off from the shore; that at this time the Republic was below her in the current about two hundred and fifty or three hundred yards, and to the larboard of her about the same distance; that as soon as the Cleona sheered to the larboard he pulled to the larboard,

and rang first the stopping-bells and then the backing-bells, and that the Cleona gave no signal until she had been running out about half a minute, when she blew two blasts of her whistle, and that the collision occurred in about half a minute from the time the backing-bells were rang.  This pilot acted on the belief that the Cleona had sheered when she made the sudden turn, and, therefore, followed her until he overtook her in the middle of the river, instead of keeping his course, which the whole evidence shows would have prevented the collision.

That the Cleona's movement was not a mere sheer is manifest enough, but what right had the pilot to proceed on that supposition?  Impressions of this sort are not admissible, and ought never to be entertained by a pilot, and if disaster occurs the consequences must rest on the boat he is guiding.  The cause of this collision is clearly traceable to this mistake, and, to use no harsher term, the pilot showed great incapacity on the occasion.  It was his duty to have kept his course, and if he had done this instead of swinging to the larboard the accident would not have happened.  Even had he ported his helm but for a few seconds after the danger was imminent, it would at least have checked the swinging of his boat to the larboard, and this would have prevented the disaster, as the evidence shows ten feet would have cleared the Cleona, and five feet saved everything except a few of her wheel-arms.

As boats are not apt to sheer in deep water there was no excuse for the mistake made by the pilot.  If, however, sheering were possible, as it is out of the common course of things, ordinary prudence would have told this pilot to have exchanged signals, so as to have understood what the movement was.  Instead of this he did not answer the signals of the Cleona, which the law says he must do, in order to avoid mistakes.  Two whistles were blown on the Cleona, which this pilot and others on board the Republic interpreted as meaning but one signal.  Whether these whistles constituted one signal or two, answer should have been

made, and, it may be, if this had been done the result would have been different.

The signals were given by the Cleona for each boat to keep to the right, and, if seasonably given, were the proper ones.

It is said, however, that the Cleona should have given three whistles, indicating a purpose to land, but the boat was not close enough to land, and all the signal that was required was one which should tell which side she desired to take.

But the pilot says no signal was given by the Cleona until half a minute after she turned to cross. If so, and the Cleona omitted such a plain matter of duty, why did he not supply this omission by signalling as soon as he discovered the danger? That he thought danger was imminent as soon as the Cleona made the turn is manifest, because he says he rang the bells at once to stop and back. It was, however, his duty, as his boat was astern and gaining rapidly on the other, to have given the first signal; but even if this were not so, any self-possessed pilot, having a due regard for life and property, as soon as danger was threatening, would have signalled in order to call the attention of the other boat to the condition of things. If this had been done, is there any reason to suppose the signal would not have been obeyed? and if obeyed the courts would never have been troubled with this case. The precautions against danger of necessity, in any case, rest to a greater extent upon the boat in the rear than upon the boat in advance, and this is eminently true of a large and fast steamer following a small and slow boat.*

But the pilot says that as soon as the Cleona turned to cross, he took instant means to stop and back his boat. If so, it is singular that his boat, having two hundred and fifty yards to go, almost in the same direction with the Cleona, run her down with great violence; but the testimony of the engineer of the Republic shows, unmistakably, that the pilot,

---

* Whitridge et al. v. Dill et al., 23 Howard, 454.

to say the least, is mistaken in this particular. Indeed, it is very doubtful from the evidence whether the engines of the Republic were stopped at all until the collision occurred, but if they were, it was at a point of time much later than, that named by the pilot. It is true the pilot gave the signal to stop and back, and this signal was obeyed, but the engineer does not know how far off the Cleona was when he was signalled to stop and back, nor can he tell what period of time elapsed between the first ringing of the bell and the collision. He does tell, however, the important fact that the Republic, going up stream at the rate of twelve or fourteen miles an hour, can be stopped " dead " in seventy-five yards, and gives the reason why she can be stopped quicker than ordinary boats of her class navigating the Mississippi River.

In the light of this testimony, which must be accepted as true in the absence of any evidence to the contrary, plainly the pilot did not take the steps to check the speed of his boat when he says he did, nor, in fact, until the collision was inevitable.

There is evidence in the record tending to show that the pilot was addicted to drinking when ashore, and he confesses to drinking on that day, but not for six hours before he left port. It may be that he was not under the influence of liquor on this occasion, but if not, his conduct is inexplicable on any other theory than ignorance of the ordinary rules of navigation, or reckless inattention to duty. There were ample means and opportunity to avoid this collision, and yet it occurred. In the midst of danger seconds of time are important, not to speak of minutes, and the clear-headed pilot who recognizes this fact, and makes no ventures, is not apt to bring his boat into trouble. Practical steamboat men, passengers on board the Republic, understood the movement of the Cleona to be for the purpose of crossing the river, and yet the pilot in charge mistook it for sheering. They could see plainly enough if he kept his course the collision would have been avoided, and there was plenty of room to pass on the starboard, and he took exactly the opposite direction. With ability to stop his boat in seventy-

five yards, he does not do it in two hundred and fifty yards. In charge of the wheel of one of the fastest and largest steamers on the river, and in plain sight, all the way from New Orleans, of a small coasting vessel engaged in landing freight and passengers at the plantations on both sides of the river, he runs her down with such violence as to cause her to careen over, without using any signals at all, or answering those she gave, or taking any precaution until too late to escape danger. If all this does not constitute mismanagement, to use no harsher word, it is difficult to understand what does. The slightest exercise of ordinary skill and prudence would have avoided the accident. Even after the peril was imminent, the simple act of bearing to the starboard, instead of the larboard, would have brought the Republic's stem clear of the Cleona's stern.

There are other witnesses for the respondents who, in the matters of distance and time particularly, differ with the pilot at the wheel, but we do not feel called upon to review their testimony, as it does not, in our judgment, change the result, and would unnecessarily lengthen this opinion.

It may be that this collision would have been avoided if there had been any proper officer in good season on the roof of the Republic superintending her navigation. The pilots seem to have had, on this occasion, the whole charge of her navigation, for the captain, whose watch it was, was sitting on the lower or boiler deck, talking to a passenger, until his attention was called to the danger of a collision.

Under the circumstances of this case, the burden is on the Republic to excuse herself, she being the following vessel, and having actually overtaken the Cleona and run her down. And in any case of collision, whenever it appears that one of the vessels has neglected the usual and proper measures of precaution, the burden is on her to show that the collision was not owing to her neglect.*

If we are correct in our own interpretation of the evidence,

---

* Meyer v. Steamboat Newport, opinion by Judge Blatchford, 14 Internal Revenue Record, 37; The Schooner Lion, 1 Sprague, 40.

enough has been said to condemn the Republic, and there is nothing in the record to excuse her.

As we have seen, she could have avoided this collision, even after danger was imminent. If she had stopped, or ported her wheel a second or two before the collision occurred, she would have gone clear of the Cleona. On the contrary the Cleona's course after she saw the Republic following her, was to try and get out of her way. This course she pursued diligently, for she packed on all the steam possible, and succeeded so far as to save her hull, and came near escaping altogether. On a full and fair consideration of the whole evidence, we are satisfied the officers of the Cleona, when the boat was turned to the right shore, had no ground to fear a collision, and that the boat itself was far enough ahead to cross with safety, if the Republic, instead of following after her, had pursued her course on the left side of the river. It is pretty clear that the Cleona did not blow her whistle for each boat to keep to the right, as soon as she started for the opposite shore. This omission was a fault, but this fault bears so little proportion to the many faults of the Republic, that we do not think, under the circumstances, the Cleona should share the consequences of this collision with the Republic.

DECREE of the Circuit Court REVERSED, and the cause remanded, with directions to enter a decree for the libellant and for further proceedings in conformity with this opinion.

REVERSAL AND REMAND ACCORDINGLY.