## THE LEVERSONS.

(*District Court, D. Maryland.* February 20, 1882.)

1. COLLISION—CONFLICT OF TESTIMONY—IMPROBABLE CASE.

Where, in a libel by the owners of a sailing-vessel against a steam-ship for damages for a collision, the testimony was in direct and irreconcilable conflict, and the testimony of the libellant's witnesses was discredited because of the improbabilities of the case attempted to be established by them, the libel was ordered dismissed.

In Admiralty.

This case having been once argued in the district court, the judge, after considering the case, directed a reargument. It was then at his request, and with the assent of counsel, reargued before both the district and circuit judges as if on appeal.

*John H. Thomas,* for libellants.

*Brown & Brune,* for respondents.

MORRIS, D. J. This libel is filed by the owners of the American schooner David E. Wolff, (122 tons,) against the British steamer Leversons, (916 tons,) to recover damages resulting from a collision in the Chesapeake bay. The schooner was bound down the bay from Baltimore to Portsmouth, Virginia, laden with 200 tons of steel rails. The steamer was proceeding up the bay on a voyage from Liverpool to Baltimore. The collision occurred between 10 and 11 o'clock at night on February 25, 1881, four miles S. E. by S. from York Spit light, the night being dark, but the atmosphere clear, and the wind a seven or eight knot breeze from the eastward. The schooner was struck on her port side, nearly at right angles, just forward of the mainmast, by the bow of the steamer, and sank immediately in water five fathoms deep. All those on board the schooner were drowned except the steward and the lookout, who were rescued from the water by boats from the steamer.

The case for the schooner, stated by the amended libel, is that the schooner was on a course S. $\frac{1}{4}$ W., with her side lights brightly burning, when those on board saw the red light of the steamer a considerable distance off over the schooner's port bow; that the schooner held her course, and the red light of the steamer continued to be visible until the steamer was about abreast of the schooner, when the green light of the steamer became visible; that immediately upon

seeing the green light hails of warning were shouted by those on the schooner; that the schooner made no effort to change her course until the steamer was in the act of striking her, when her master ordered her helm hard a-port to ease the blow, but before the order could be executed the steamer struck her port side, nearly amidship, and she sank in a few minutes.

The case for the steamer, as stated in the answer, is that she was on a course N. by E., her speed six and one-half miles an hour, in charge of a pilot, when the lookout reported a white light a point or a point and a half off the steamer's starboard bow, apparently borne by a vessel at anchor; that the pilot, upon looking at the light for a short time with a glass, discovered that it was on a vessel under way, showing no side light, and that she was changing her course and going across the steamer's bow; that thereupon he signalled to reverse the engines full speed astern, and ordered the wheel hard a-port; that at the moment of collision, which occurred very shortly afterwards, the steamer's headway was almost checked, and her bow was going off to the starboard or eastward.

The allegations of the libel and of the answer are contradictory in almost every material point, and the testimony adduced in support of each utterly irreconcilable. I have found the attempt to discover how the collision was brought about attended with more than the usual embarrassment. At the conclusion of the first hearing I was strongly inclined to take the same view of the case as at present, but a great anxiety lest by overlooking some fact, or failing properly to estimate some portion of the testimony, I might be doing injustice to men who have already been great sufferers by this disaster, caused me to hesitate. After a second hearing I find my first impressions strengthened, and I am able to adhere to them with increased confidence since the learned circuit judge, with his larger experience in dealing with such cases, has independently arrived at the same determination.

Why it is that in case of direct conflict the statements of some witnesses convince the mind, and the statements of others fail to do so, is often difficult of explanation, and in this case I shall be able to do hardly more than indicate some of the considerations which have had influence in bringing us to the conclusions I am now to announce.

It is first to be noticed that the case stated in the libel is highly improbable. It is alleged that the red light of the steamer was seen

for a considerable time off the schooner's port bow; that the schooner never changed her course; and that the steamer's red light continued to be seen until she was about abreast of the schooner. The wind was fair for the schooner—a seven or eight knot breeze—and her speed must have been about the same as that of the steamer, viz., six and one-half miles an hour. How was it possible, then, for the steamer, continuing to show her red light on the port side of the schooner until she was abreast of her, to then turn a right angle and strike the schooner a perpendicular blow amidship before the schooner passed by? These allegations of the libel were, of course, based on the statements of the schooner's steward and lookout—they being the sole survivors—and their testimony, as given in court as to the movements of the two vessels, increases rather than diminishes the difficulty of comprehending why the vessels came into collision.

The lookout of the schooner states that he first saw the steamer's red light over the port bow upwards of a mile off; that he continued to see the red light until those on the schooner began to halloo; that the red light was well off the schooner's port bow; and that when the steamer's green light opened and he saw both of the steamer's lights, she was fully abreast of the schooner, well back from the bow, where he was standing, and about opposite to the midship of the schooner.

The steward testifies that he was standing aft of the wheel and saw the red light over the port bow when it was reported, eight or ten minutes before the collision; that he continued to see the red light well on the port bow, until the steamer was about two of her lengths off and abreast of the schooner's forward rigging, when both the steamer's lights became visible to him, and suddenly her red light disappeared and the steamer struck them amidship, the steamer's stern inclining towards the stern of the schooner.

Making all possible allowances for mistakes as to time or distance, it still seems to us impossible to understand how the collision could have occurred in the manner or for the reasons given by these witnesses; and as the libellants' case rests on their testimony, it is only reasonable that, in examining other statements made by either of them, we should be quickly impressed by any improbabilities.

In the testimony of the steward he states very positively that he was standing by the binnacle just prior to the collision, and noticed the compass and the course of the schooner, which he states was S. $\frac{1}{4}$ W., with the wind E. S. E. From his answers under cross-examination it is obvious that he is ignorant of navigation and of the

points of the compass; and one wonders that although it was not at all in the line of. his duty he should have observed and be able to give the schooner's course to a quarter of a point. The fact that we find on the coast-survey charts the course for a vessel proceeding southward at the point of collision marked down as S. $\frac{1}{4}$ W. must give rise to suspicion. On a sailing-vessel of that humble class, used only in the bay traffic, with 200 tons of iron in her hold, it would be remarkable to find her compass agreeing to such nicety with the course marked on the chart. And indeed if it were true that her compass did so indicate, it would be by no means conclusive evidence that such was her true course.

There is another statement made by both steward and lookout which is difficult to account for. The schooner's crew consisted of the master, mate, and two seamen, and the steward; the latter not doing duty as a seaman and not being in either watch at the time of the collision. The only men, therefore, whose duties required them to be on deck were the mate and the lookout. The collision occurred between 10 and 11 o'clock, and the watch of the master and the other seamen did not begin until 12. The night was very cold. The weather had been so cold and the upper part of the bay so full of ice that the schooner had been four days getting from Baltimore, and had gone into harbor four times in making less than 200 miles. The testimony of these two witnesses is that every man had been upon deck for a long time before the collision occurred, and they are able to give no reason for it except the steward's statement that the captain came up about half past 9, saying he could not sleep, and the lookout's suggestion that they were all up, perhaps, because they were going to anchor under Sewall's Point, which was not less than three hours distant from the place of collision. That all hands should have been on deck on such a night without having been called up by notice of danger seems very extraordinary, and to need some better explanation.

The amount of the loss in clothes and money which the steward says he sustained appears to be very unusual.

With regard to the schooner's course, while the course marked on the coast-survey charts, and given by the steward with such exactness, is the course for a vessel intending to pass out the capes, it does not appear to me that it would be the course for a vessel of small draught at the place of collision bound for Sewall's Point or Portsmouth, Virginia. It would seem more reasonable that with a fair wind she should take as direct a course as possible, and it ap-

pears from the charts that she would have sufficient depth of water on a course a little east of the Thimble light, which bears S. W. by S. from the place of collision.

Carefully and I trust fairly weighing the testimony of these two witnesses for the libellants, I find in their statements so much that seems impossible, so much that is highly improbable, that, notwithstanding their most positive and circumstantial evidence that the lights of the schooner were burning brightly, I have not been able to bring myself to think that it would be safe to find any fact as established by their uncorroborated testimony.

We come next to the testimony adduced in behalf of the owners of the steamer, and to the consideration of the question whether, even if the libellants' testimony does not account for the collision, any facts are proved which show that the steamer was in fault in not keeping out of the way and avoiding the schooner.

The pilot was a young man who had not yet obtained a full certificate to pilot vessels of over $12\frac{1}{2}$ feet draught, and he was accepted by the master of the steamer only because there was no full branch pilot on board the pilot-boat which spoke him off the capes. His capacity and acquirements are, however, fully proved by the older pilots, and they seem to have thought well enough of him to appoint him master of their own steam pilot-boat. He states that he was on the upper bridge, and that the steamer had been for half an hour on a course north by east by her compass, but as the compass varied a point to the west, her true course, and the course he intended her to be on, was due north; that after she had been on that course half an hour the lookout reported a white light ahead; that he put up his glasses and saw a vessel with a white light about a point and a half over the steamer's starboard bow and about 300 yards off; that at the first moment he supposed it was the light of a vessel at anchor, but that putting up his glasses he saw it was a vessel under sail, apparently moving in a southerly direction; that almost immediately he observed that she was changing her course so as to cross the steamer's bow; that he at once ordered the helm hard a-port and signalled by the telegraph to reverse the engines at full speed astern; that under the port helm the steamer's bow went off easterly to N. E. by N., which was her direction at the moment of collision; that just before the collision and when the port side of the schooner was towards him he saw that the dim white light which had been reported came from her cabin; that if the schooner's port light had been burning he could not have failed to have seen it.

The pilot's testimony, that the schooner was about 300 yards off, about a point and a half on the starboard bow when first seen, and that she had no side lights, is confirmed by the testimony of the lookout, the man at the wheel, the boatswain, and by the master of the steamer. Their statements as to the change in the schooner's sails differ somewhat, but not more than might be expected when it is considered that the pilot alone had the aid of glasses, and that some of these witnesses did not make out the hull and sails of the schooner until she was very close. They all agree, however, that at the moment of collision the sails were on the schooner's port side.

A further analysis of the testimony of the persons on the steamer would be useless. We have become convinced that it is from their statements that we are to gather the facts of the collision, and we find no reason to disbelieve the substantial truth of the cause they assign for it. The principal difficulty I had at the first hearing arose from the testimony introduced by the libellants to impeach the boatswain of the steamer. A number of witnesses have testified that after the steamer arrived in port the boatswain, on several occasions, made a different statement about the schooner's lights, sometimes in the presence of the lookout and the wheelsman, who did not dissent from what he said.

If what these impeaching witnesses suppose the boatswain said in the conversations they report was really what he intended to say, (which he denies,) and he said what he believed to be true, then there can be no truth in any of the testimony of the steamer's witnesses from first to last. If he did intend to say that the schooner's red light was visible, and that she did not change her course, the acceptance of these statements as true would involve the collision in so much that is unaccountable and irreconcilable, that we hardly see how we could have believed the boatswain if he had, as a witness, sworn to what is sought to be inferred from these chance conversations with him. That the boatswain had but little opportunity to carefully observe the schooner is obvious. He states that he was trimming the lamp of the pole-compass when he heard the light reported; that as he came down onto the lower bridge he saw the small white light off on the starboard bow, and he took it to be an anchor-light. At that instant, he states, he heard the bells to stop, and, taking a better look, he saw the side of a vessel, and that a collision was imminent. He sprang from the bridge to the deck and ran onto the top-gallant forecastle just in time to see the schooner cut down and her mainmast fall over the steamer's bow, driving every one off the forecastle deck. With

regard to what he is reported to have said as to the red light, I think the truth must be as stated by him in his testimony: that as he was running to get onto the forecastle he saw a red light, which was the fixed red light of the York Spit light-house, which bore about northwest, and which he then thought was a vessel's light, but that when he got up on the forecastle head he discovered its real character.

My own impressions as to the weight fairly to be given to the testimony which tends to impeach the boatswain have been much strengthened by the decided views of the circuit judge as to that branch of this case.

Counsel for the schooner have urged that even if it were true that the schooner's side lights were not visible, that her sails and hull might have been seen at a distance sufficient to have enabled the steamer to make out her course and avoid getting so close to her. The night was dark, with a clear atmosphere; and the testimony of experts shows that on such a night a vessel without lights should be seen with the naked eye from 300 to 400 yards off. The distance would, of course, vary with the size of the vessel and the spread of her sails. This schooner was almost of the smallest class, and when approaching the steamer her sails were rather flat aft. The testimony of those on the schooner shows that she was discovered at the distance at which she might reasonably be expected to be seen by an attentive lookout. It is, however, suggested that had the pilot more diligently employed his glasses in searching for lights ahead, he might have discovered the schooner before she was reported by the lookout. It seems to me, however, that the special use of the glasses is rather to more clearly discover the character of an object that has been already discovered. At all events, I do not think that an ordinary steamer, running at a moderate speed in a bay over 10 miles wide, should be condemned for having failed to discover a sailing-vessel without lights merely because there is a possibility that if the officer or pilot in command had been constantly sweeping the horizon with a good pair of glasses, the vessel, even without lights, might have been seen in time to avoid her. In our judgment the steamer has been shown not to have been in fault, and the libel must be dismissed.

NOTE. Where there is a great conflict of testimony the court must be governed chiefly by undeniable and leading facts, if such exist. *The Hope*, 4 FED. REP. 89; *The Great Republic*, 23 Wall. 20. And where a witness, otherwise unimpeached, testifies to that which, in its nature, is incredible, his testimony is not necessarily to be believed. *United States* v. *Borger*, 7 FED. REP. 193; *The Helen R. Cooper*, 7 Blatchf. 378.—[ED.