The PURE OIL COMPANY
v.
JACK NEILSON, Inc. and The Tug JIM.
No. 2618.

United States District Court
E. D. Louisiana, New Orleans Division.
Nov. 21, 1955.

Deutsch, Kerrigan & Stiles, Francis Emmett, New Orleans, La., for libellant.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., for respondent.

WRIGHT, District Judge.

At 2:30 P. M. on April 14, 1954, at a point just east of Milepost 70 (west of Harvey, Louisiana) on the Gulf Intracoastal Waterway, the M/V Bob McIlvain, a converted United States Navy YMS, was in collision with the lead barge in tow of the Tug Jim. The McIlvain alone sustained damage and libellant seeks recovery therefor in this suit.

The McIlvain departed Harvey, Louisiana, at approximately 7:40 A. M. on April 14, 1954, bound west in the Gulf Intracoastal Waterway for Morgan City, Louisiana. She was a wooden vessel approximately 125 feet in length, with a beam of 27 feet and a draft of 9 feet. She was propelled by two 500-HP General Motors diesel engines that were controlled from her pilothouse. On this voyage, she was manned by a crew of six and was in all respects seaworthy.

The Jim, owned by claimant-respondent, was a small steel tug approximately 42 feet in length, with a beam of 14 feet and a draft of 4 feet. She was powered by two General Motors diesel engines of 110-HP each, which were controlled from her pilothouse. An automobile horn served as her navigation whistle. Her crew consisted of a master and one deckhand. At the time of collision, she was towing four light steel barges in tandem on a short hawser and bridle. The two lead barges in her tow were tank barges, each approximately 175 feet in length. The tail barges were approximately 125 feet and 100 feet in length, giving the tow a length over-all, exclusive of tug, of almost 600 feet.

When the Jim was first sighted, the McIlvain was proceeding west in a straight reach of the waterway east of Milepost 70. She was in the center of the waterway navigating at full speed ahead, or about 10 miles per hour over the ground. The Jim, at the time, was west of Milepost 70, around a slight bend, proceeding east in the center of the waterway with her tow favoring the south bank. She was making good a speed of about 4 miles an hour. The waterway in

this vicinity runs east and west and is approximately 300 feet wide. Proceeding west, it turns to the right at an angle of approximately 25° at a point just east of Milepost 70. Visibility was unlimited over the point of this slight bend. The weather was clear and there was little or no current in the waterway. The wind was blowing out of the south at about 15–20 miles per hour, not enough to endanger the navigation of vessels under proper control.

The McIlvain and Jim continued to close without exchange of passing signals, holding their same relative positions in the waterway until they were approximately one-half mile apart. The McIlvain had been waiting for the encumbered vessel, the Jim, to indicate by signals on which side she wanted the McIlvain to pass. Having waited in vain, at this point the McIlvain blew one short blast of her whistle, proposing a port-to-port passing. She reduced speed to about four or five miles per hour over the ground and moved close to her own right-hand, or north, bank of the waterway. The McIlvain heard no reply to the one-blast signal but continued ahead under the reduced speed, close to the north bank for about two minutes until the Jim was within 150–200 feet.

At this time it was observed that the Jim was experiencing difficulty controlling her tow, which was then coming around the slight bend near Milepost 70 and was strung out so that the stern barge was close to the south bank and the lead barge was in the McIlvain's half of the channel, heading for the north bank and the McIlvain. The Jim was pulling toward the south bank in an attempt to straighten her tow. Realizing for the first time the danger of collision, the McIlvain put her engines in neutral and then full astern. Collision followed less than one minute later, at a point some 25 or 30 feet off the north bank of the waterway and 200 or 300 feet east of the bend near Milepost 70. The Jim and the McIlvain passed port-to-port, but the bow of the lead barge in the Jim's tow struck the McIlvain's stem, twisted her bow

around to a 45° angle in the waterway and drove her stern up on the north bank. The McIlvain was almost dead in the water at the time of impact and her engines were going full speed astern. The starboard engine stopped when her stern was driven into the north bank of the waterway. The Jim and her tow were still making approximately 4 miles an hour upon impact, the Jim having made no effort to stop and reverse. If she had, her lead barge would have, in all probability, ridden up on her and sunk her.

Following the collision, the masters of the respective vessels exchanged information concerning identification and ownership. At this time the Jim was requested to test her whistle because she asserted that she had made signals which were not heard on the McIlvain. The master of the Jim then blew what seemed to be an automobile horn which was not audible for more than 100 feet, and probably less when underway and contending with the noise of the engines.

Other than a shore representative, respondent produced only the master of the Jim to testify. His confused version of the events leading up to the collision differs materially from that given by the five witnesses from the McIlvain. In addition, on direct examination he indicated that the McIlvain had passed the Jim to port immediately prior to the collision, whereas on cross, he testified, and insisted, that the McIlvain had passed on the starboard side of the Jim. The admitted physical facts, particularly the fact that the McIlvain was driven stern first on the north bank of the waterway by the force of the collision, support the testimony of the five witnesses from the McIlvain, and the master of the Jim on direct, to the effect that the McIlvain passed the Jim to port immediately prior to the collision. Accordingly, the testimony of the Jim's master is unworthy of belief and is not credited.

Libellant contends that the Jim's violation of the narrow channel rule was the proximate cause of the collision. It contends further that the Jim was unseaworthy in that she was underpowered,

unable to control her tow, and not equipped with an efficient whistle. Respondent contends that the sole cause of the collision was the failure of the McIlvain to shut down and reverse before collision became inevitable and that the McIlvain failed to accord the Jim, the encumbered vessel, the right of way.

■ The proximate cause of the collision was the failure of the Jim to have on board an efficient whistle, audible for the required distance of at least one mile. 46 C.F.R. § 25.10–10. When the Jim made her left turn into the bend, the tail barges of her long tow whipped to the right, or south, side of the waterway, forcing the Jim herself and the lead barges toward the north side. Underpowered as she was, the Jim was unable to pull the lead barges of her tow off the north bank far enough to allow the McIlvain to pass port-to-port, in compliance with the narrow channel rule. Inland Rules, arts. 18, 25, 33 U.S.C.A. §§ 203, 210. If the Jim's whistle had been audible for the required distance, she could have sounded the danger signal and thus notified the McIlvain of her predicament in time for the McIlvain, by shutting down and reversing, to avoid the collision. The danger signal, which the Jim's master testified he sounded, was not heard on the McIlvain. If it had been, the collision may not have ensued.

■■ The McIlvain was not at fault for continuing ahead on her own right-hand side of the waterway at reduced speed after her whistle signal proposing a port-to-port passing went unanswered. She had a right to assume that the Jim would obey the law and make the required port-to-port passing in the narrow channel. The Victory (The Plymothian), 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519; The Delaware, 161 U.S. 459, 469, 16 S.Ct. 516, 40 L.Ed. 771. It may be argued that the McIlvain waited until collision was inevitable before she shut down and reversed. See The New York, 175 U.S. 187, 201, 207, 20 S.Ct. 67, 44 L.Ed. 126. Instead of assuming that the Jim and her lead barge would not continue into her pathway on the north side of the waterway, perhaps the McIlvain should have stood clear until the intentions of the Jim were clearly discerned. But the intentions of the Jim were already manifest. The tail barges of the tow were near the south bank of the canal and the Jim was attempting to pull her lead barges over to that side as well. The McIlvain was not required to assume that the Jim was so underpowered [1] that she would not succeed in this maneuver in time to allow the McIlvain to pass close to the north bank. See Griffin, Collision § 211.

■■ Even if the McIlvain did not shut down and reverse her engines when the danger of collision first became apparent, she should not share the consequences of this collision for her minor omission in this respect, particularly where, as here, her fault has not been shown to have been a contributing cause of the collision. The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55; Compania De Maderas De Caibarien v. The Queenston Heights, 5 Cir., 220 F.2d 120, 1955 A.M.C. 797. The gross negligence of the Jim clearly appearing as the proximate cause of the collision, it is not required that the conduct of the McIlvain be scrutinized narrowly for fault. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Coastwise, 2 Cir., 68 F.2d 720.

Decree for libellant.

---

[1]. Apparently the owners of the Jim realized that she was unable to handle her long tow. After the collision, and en route to original destination, the Jim was relieved of two of her barges by the Tug Bolivar.