AVONDALE MARINE WAYS, INC. and
Louis C. Dorr, Sr., Libelant

v.

THE CRESCENT CITIES, her engines, etc., and National Marine Service, Inc., Respondent.

No. 3776.

United States District Court
E. D. Louisiana,
New Orleans Division.
June 7, 1960.

Deutsch, Kerrigan & Stiles, Cornelius G. Van Dalen, Christopher Tompkins, New Orleans, La., for libelant.

Terriberry, Rault, Carroll, Martinez & Yancey, Edward S. Bagley, New Orleans, La., for respondent.

J. SKELLY WRIGHT, District Judge.

In the early morning of April 26, 1958, in the harbor of New Orleans, the lead barge in the tow of the tug Crescent Cities struck the starboard quarter of the M/V Big Louie, causing her to capsize and sink. The owner and bareboat charterer have libeled the Crescent Cities and her owner for the loss of the tug, and the owner of the Crescent Cities, National Marine Service, Inc., has cross-libeled for damage to the barge.

Shortly before 1:00 A.M., April 26, 1958, the Big Louie [1] departed the fleet landing of Federal Barge Lines, Inc., on the west bank of the Mississippi River just below Nine Mile Point, and proceeded downstream, bound for the Federal Barge Lines lower fleet landing above Six Mile Point at the foot of Audubon Street on the east bank of the river. She was pushing a tow of four barges made up in two tiers, two abreast, and was faced up to the after barge in the starboard string.[2] The weather was fair, there was little or no wind, and the current in the river was about three MPH.

As the Big Louie proceeded downriver about two thirds of a mile above her destination, she ran into light patches of fog. She reduced her speed from about seven MPH to approximately four MPH and began sounding fog signals. When she reached a point nearly opposite the fleet landing at Audubon Street, she rounded to and headed upstream preparatory to landing her barges starboard side to the fleet. This maneuver was completed in the western half of the river.[3] As the Big Louie steadied on an upstream heading, she was about mid-river just above the point of Greenville Bend,[4] also known as Six Mile Point. The fog in the bend was thicker and visibility

1. The Big Louie was a twin-screw diesel towboat, 45.2 feet in length, 18 feet in beam, with a draft of about 6 feet, powered by two 300-horsepower diesel engines which were pilothouse controlled.

2. The tow of the Big Louie consisted of one partially loaded and three loaded barges. The Big Louie's tow was 390 feet in length, 61 feet in width. The total gross tonnage of the four barges was 2,380 tons.

3. The Mississippi River is approximately 1,800 feet wide at this point.

4. Greenville Bend is a 45° turn to port for downbound vessels.

was reduced to between 200 and 300 feet. The Federal Barge Lines mate in charge of the barges, Nickelotte, and two members of the tug crew had gone out on the tow and stationed themselves on the lead barge.

While in this mid-river upstream position preparatory to proceeding toward the east bank and the fleet landing, the Big Louie received a radio telephone call from the Crescent Cities,[5] then upbound in the river a mile below Greenville Bend, holding close to the east bank. Fontenot, captain of the Big Louie, and Terrell, pilot of the Crescent Cities, advised each other by radio of the relative positions of their tows in the river and agreed on a one-whistle passing, it being understood that the Big Louie would heave to approximately midstream to await the passage of the Crescent Cities on her starboard side.

The Crescent Cities, with only her pilot above deck and with no lookout on her tandem tow of two loaded oil barges, was proceeding full ahead in dense fog, making good seven MPH through the water and relying wholly on her radar for guidance. After the telephone conversation with the Big Louie, she widened out in the river in order to run her tow under the point at Greenville Bend. In so doing she allowed the current to bear down on the starboard side of the tow, driving it out farther in the river than intended and into the starboard quarter of the Big Louie. During this maneuver, the Crescent Cities was proceeding blind. Her pilot not only did not see the Big Louie, he could not see the head of his own tow. On collision the Big Louie capsized, broke away from her barge, was swept down the river, and sank.

The faults of the Crescent Cities are so gross that her counsel concede that she must be condemned, the effort here being merely to saddle some fault on the Big Louie in order to divide damage. But even where fault is admitted, unless it is sole fault, it must nevertheless be assayed. The application of the major-minor fault rule has become a popular pastime in this circuit, so that proof of mutual fault does not automatically lead to divided damage.[6] Here the faults of the Crescent Cities are so gross, as compared to those of the Big Louie, that she must be found wholly to blame for this collision.

To begin with, the Crescent Cities' failure to have a lookout[7] on the head of her 600-foot tow defies explanation. Her pilot's visibility, by his own statement, was limited by fog to 220 feet, and her radarscope would not reflect objects within a half mile of the vessel. Yet the Crescent Cities pushed on. Here is an instance where the use of radar precipitated a collision.[8] Without radar, the Crescent Cities would never have been proceeding upriver full speed ahead in a dense fog. Moreover, the attempt of the pilot to navigate the vessel and watch the radarscope at the same time should also be condemned. The use of radar is actually a menace to navigation where the same navigator is expected to use both the radar and his visual acuity because an immediate eye adjustment cannot be made from radar to visual.

5. The Crescent Cities is a single-screw diesel tugboat, 80.6 feet in length, 23 feet in beam, and 11.4 feet in depth. She is powered by a single 700-horsepower diesel engine which is engine room controlled. At all material times she was pushing a tandem tow of two loaded 20,-000-barrel tank barges, each measuring 260 feet in length and 50 feet in beam. The combined overall length of the flotilla was about 600 feet.

6. The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55; Jack Neilson, Inc. v. Pure Oil Co., 5 Cir., 233 F.2d 790; Compania De Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120; The Peerless v. Easton & McMahon Transp. Co., et al., 4 Cir., 66 F. 77.

7. Inland Rules, Article 29 (33 U.S.C.A. § 221).

8. For other cases involving improper use of radar see:
   Polarus Steamship Co. v. The T/S Sandefjord, 2 Cir., 236 F.2d 270, 1956 A.M.C. 1779; Wood v. United States, D.C.N.Y., 125 F.Supp. 42, 1955 A.M.C. 142; The Triton-Baranof, Sup.Ct. of Canada, 1956 A.M.C. 967.

The speed of the Crescent Cities in the circumstances is also to be condemned.[9] The Crescent Cities was at full speed, making good four knots against the three-knot current. Actually, having heard a fog signal forward of her beam, she should have been stopped as required by Rule 16, for she was totally unaware of the position of the Big Louie except that the Big Louie was upstream in the Mississippi River. The explanation that the Crescent Cities had to proceed at full speed in order to maintain steerageway against the current will not do. Where the current is such as to require a vessel to exceed the proper speed in a fog to maintain steerageway, that vessel should not be under way in the first place.[10]

Most of respondent's charges of fault against the Big Louie are not supported by the evidence. There was no fog in the river at Nine Mile Point, as contended by respondent, when the Big Louie started downriver. On meeting fog, she was within a short distance of her destination, which, in fact, presented the nearest safe refuge for her and her tow. Also, in spite of respondent's suggestions to the contrary, there is no question but that the Big Louie was hove to approximately in mid-river when struck by the tow of the Crescent Cities. This fact is confirmed, not only by the testimony of her captain, but also by that of Nickelotte, the Federal Barge employee, and one Camaille, captain of the tug F. N. Canulette which picked up the Big Louie's barges after she sank. These witnesses also confirm the fact that Terrell, the pilot of the Crescent Cities, knew that the Big Louie was hove to in mid-river awaiting the Crescent Cities' passage on the east side. They were witnesses to the radio conversation between the vessels.

Other allegations of fault levelled at the Big Louie are primarily technical in nature. Respondent contends that the Big Louie was negligent for failing to exhibit a flare-up light as permitted by Article 12 of the Inland Rules. 33 U.S. C.A. § 181. The testimony shows that the Big Louie was displaying a stern light which the Crescent Cities did not see, and there is no reason to believe any other type of light would have been successful in attracting the attention of the radar-watching pilot of the Crescent Cities.

The suggestion that the Big Louie violated Article 18, Rule IX, of the Inland Rules because she agreed to a one-whistle passing when the vessels were not within sight of each other is truly grasping. The evidence shows that the agreement was reached in a radio telephone conversation at a time when the Big Louie was already hove to awaiting the passage of the Crescent Cities. The reason for the rule is to prevent confusion between passing signals and fog signals. Where, as here, the passing agreement is reached by radio and merely confirmed by whistle signals, it would seem that the charge of fault in this regard is without substance.

Finally, it is charged that if the Big Louie had sounded a danger signal when the Crescent Cities and her tow were first sighted, the collision might have been averted. At that time, however, the tow of the Crescent Cities was only 200 feet off the stern of the Big Louie, headed at her starboard quarter. Making good four knots against the current, it took the Crescent Cities' tow approximately a half minute to close those 200 feet. Certainly a danger signal would not have allowed the Crescent Cities an opportunity to alter course to avert the collision because, admittedly, the pilot of the Crescent Cities had no idea where the Big Louie was in the river. Moreover, in one-half minute the Crescent Cities would not have had an opportunity to communicate a stop and reverse command to the engineer in her engine room

9. Article 16 of Inland Rules (33 U.S.C.A. § 192); The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053.

10. The Pennsylvania, 19 Wall. 125, 134, 86 U.S. 125, 134, 22 L.Ed. 148; Lillian Anne-Pennsylvania, 2 Cir., 1934 A.M.C. 569, 571.

in time for that command to be carried out. Actually, on first sighting the Crescent Cities, the pilot of the Big Louie thought her tow would pass clear. When it became apparent that the danger of collision existed, he tried desperately to warn the Crescent Cities by radio. In extremis, this action should not be condemned. Under the circumstances, it could have been more effective than sounding the danger signal.

Decree for libelant.