## THE CULLEN NO. 32.

### Petition of CULLEN FUEL CO., Inc., and three other cases.

District Court, S. D. New York.
Nov. 18, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (J. D. Eggleston, of New York City, of counsel), for Cullen Fuel Co., Inc.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (P. F. Shortridge, of New York City, of counsel), for Long Island R. Co.

Single & Single, of New York City (T. H. Middleton, of New York City, of counsel), for W. E. Hedger & Co., Inc., demise charterer of scow.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for Port Fueling Company, stevedores engaged in unloading scow.

WOOLSEY, District Judge.

I hold the Cullen Fuel Company, Inc., liable for the accident hereinafter described; I deny its petition to limit its liability, and I hold that the claimants in that petition are entitled to their several bills of costs.

I dismiss the libel as against W. E. Hedger & Company, Inc., by the Cullen Fuel Company, Inc., with costs.

I dismiss the libel of W. E. Hedger & Company, Inc., as against the Port Fueling Corporation, with costs.

I dismiss the libel of the Long Island Railroad Company as against W. E. Hedger & Company, Inc., and Port Fueling Corporation, respondents impleaded, and the petition of Cullen Fuel Company, Inc., against them with costs to such impleaded respondents as against the Cullen Fuel Company, Inc., on whose petition they are made parties to this suit.

I. The parties concerned in this riverside drama are as follows:

The Cullen Fuel Company, Inc., was the owner of the scow Cullen No. 32, whose capsizing caused the damage out of which these several suits have arisen.

W. E. Hedger & Company, Inc., was the charterer of the scow No. 32 under the familiar harbor demise charter and had been engaged by the Grasselli Chemical Company to unload a cargo of copper barytes from the steamship Berk for which the berth on the northerly side of the Brooklyn Bridge pier had been engaged, and to transport that cargo to the Grasselli plant in New Jersey.

The Long Island Railroad Company was the lessee of Pier 22, next above the Brooklyn Bridge pier, and was the owner of the carfloat No. 10, which was lying at Pier 22, when the accident hereinafter described happened.

The Port Fueling Corporation is a corporation engaged hereabouts in loading and unloading cargoes and fuel and, on the occasion in question, was acting as contracting stevedores engaged by Hedger & Company, the charterer of the Cullen No. 32, to unload the Berk.

II. The procedural pattern of this case which is somewhat complicated should, perhaps, have a word of mention here.

The Cullen Fuel Company, Inc., was sued by the Long Island Railroad Company in the Supreme Court of New York State for damage to its leased pier, Pier 22, East River.

The Long Island Railroad Company also sued the Cullen Fuel Company, Inc., which impleaded W. E. Hedger & Company, Inc., and the Port Fueling Corporation, in this court for damage to its carfloat No. 10. This carfloat was lying overlapping the end of Pier 22, which is somewhat shorter than the pier under the Brooklyn Bridge at which the steamship Berk was lying.

W. E. Hedger & Company, Inc., was demise charterer of the scow Cullen No. 32 of the Cullen Fuel Company, Inc., and as such was bailee of the cargo on board the scow. It has brought suit in this court against the scow Cullen No. 32, the Cullen Fuel Company, Inc., and the Port Fueling Corporation, seeking to cast the responsibility for the loss of the cargo of the No. 32 on the scow or on one of those respondents.

Across this network of litigation the limitation proceeding filed by the Cullen Fuel Company, Inc., as owner of the scow Cullen No. 32, was drawn, with the result that all the proceedings in which the No. 32, or the Cullen Fuel Company, Inc., were sued, or were in the position of defendant or respondent, were stayed and all claims against them for this accident were drawn into the limitation case.

The Cullen Fuel Company, Inc., not content with defensive tactics only, however has sued W. E. Hedger & Company, Inc., as demise charterer, for damage to the scow No. 32, and W. E. Hedger & Company, Inc., not having been active in connection with the

loading and management of the scow, brought in by petition the Port Fueling Corporation as a joint respondent.

Consequently, outside of the limitation proceeding, which is the dominant proceeding before me, there still remains unstayed and to be dealt with independently the libel of the Cullen Fuel Company, Inc., against W. E. Hedger & Company, Inc., the Port Fueling Corporation impleaded, and the suit by W. E. Hedger & Company, Inc., as bailee of the cargo in so far as the Port Fueling Corporation is the respondent, and the suit of the Long Island Railroad Company against the Cullen Fuel Company, Inc., in so far as the claims against W. E. Hedger & Company, Inc., and the Port Fueling Corporation are concerned.

Therefore the opinion which I am rendering herein deals not only with the liability of the Cullen Fuel Company, Inc., for the loss hereinafter described and with its right to limit its liability therefor, but also with its right to recover for damage to the scow No. 32 against W. E. Hedger & Company, Inc., and the Port Fueling Corporation; with the right of W. E. Hedger & Company, Inc., to recover against the Port Fueling Corporation, and the right of the Long Island Railroad Company to recover against W. E. Hedger & Company, Inc., and the Port Fueling Corporation.

III. In any matters like this it has always seemed to me highly important that the locus in quo should be as clearly described as may be, and consequently I have been at some pains to get into the record the dimensions of the various vessels concerned, and also the width of the slip and the length of the piers where they were lying.

The Cullen No. 32 was a deck scow of a length of 112 feet at her deck and 90 feet at her bottom, with a 33-foot beam and with 12-foot depth of side. She had three bulkheads, which were not watertight, running fore and aft of her, dividing her interior into substantially three equal parts.

The steamship Berk is agreed to have been 346 feet long and of 54 foot beam. She was lying bow in on the north side of the Brooklyn Bridge pier with her stern considerably in from the end of that pier, which is 487 feet long.

Pier No. 22 is irregularly shaped, its downstream side, which slants slightly up the river, is 243 feet long, and the upstream side, which is at right angles to the river, is 262 feet long.

Thus it will be seen that as Pier 22 is shorter than the Brooklyn Bridge pier, there is a comparatively wide stretch of water between the end of the Brooklyn Bridge pier and the end of Pier 25, which is the next pier above Pier 22.

The width between the river ends of the Brooklyn Bridge pier and Pier 25 is 262 feet, and the width of the slip between the Brooklyn Bridge pier and Pier 22 is 150 feet at the river end. Pier 25, though it may not be of any relevance whatever, is 527 feet long.

IV. On August 12, 1925, the Cullen No. 32 had been brought down to the slip between the Brooklyn Bridge pier and Pier 22 and had on that day loaded a part cargo at the No. 2 hatch of the steamship Berk, which assumedly would be forward of the engine room.

The No. 32 had been loaded on August 12th by the United States Trucking Company derrick No. 2, and the evidence is that she had been loaded on an even keel with her cargo fairly distributed.

On the day of the accident, August 13th, the No. 32 had been moved to the No. 3 hatch of the Berk to be further loaded, and was there loaded during the morning by the Port Fueling Corporation's crane No. 2.

The loading began on the morning of the 13th at about 8 o'clock and continued until about a quarter of twelve, when, having been advised that a tug was coming with some empty scows and would remove the Cullen No. 32 with what cargo she then had on her, and the Cullen No. 36, which was practically a sister scow and had been more fully loaded than the No. 32, work on the No. 32 was suspended.

At that time the 150 feet of space between the Brooklyn Bridge pier and Pier 22 was occupied, commencing from the north side of the Brooklyn Bridge pier, first by the steamship Berk, 54 feet wide, then by the Port Fueling Corporation's crane No. 2, which was substantially 33 feet wide, and then by the Cullen No. 32, which was also 33 feet wide. Thus the slip, to a width of about 120 feet, was occupied by these three vessels, leaving about 30 feet of open water between the outer down river corner of Pier 22 and the starboard side of the Cullen No. 32 which was lying bow in.

There was 15 feet more—the width of the

outboard end of Pier 22—between the Cullen No. 32 and the carfloat No. 10.

I think that this substantially describes the setting for what afterwards happened.

V. Now in a case like this it seems to me that the trier of the facts has to endeavor to find what facts are either admitted or proved without challenge, and then take those master facts as a kind of frame for the disputed facts. He must then see whether any contentions as to the disputed facts will fit in with the master facts.· If any such contention does not fit, the side so contending must clearly be wrong, because one of the most important elements in any case is the element of probability based on the master facts.

Now, having seen all the witnesses, the master facts which seem to me sufficient to control my disposition of these cases without attempting perhaps to make an exhaustive list of ·them, are—

1. That at 11:45 a. m. on August 13, 1925, the loading of the Cullen No. 32 was stopped for reasons of convenience, when she had·been loaded level and just after her master had asked to have a single bucketful of ore, which would weigh about two tons, put near her after starboard corner in order to give her a slight list of an inch or so towards the pump there situated.

2. That at that time she had on board about 375 tons of copper barytes stowed quite low with the longitudinal peak of the pile substantially in the center of the scow.

3. That this load was substantially less than the load of her sister scow, No. 36, to which nothing happened, for No. 36 had on board between 500 and 550 tons of ore and was stowed at least two or three feet higher than the No. 32.

4. That copper barytes is a cargo with a somewhat steep angle of repose, which means that when piled it does not slide easily. The reason for this is that·it has some large lumps in it and is of rather a cohesive character.

5. That when the men engaged in the work of loading the scow No. 32 returned from their luncheon, they observed that she had a noticeable list, especially at her. starboard stern. Estimates of angles are always deceptive, but the estimate is that this list must then have been at that point somewhere in the neighborhood of 15 degrees.

6. The list, thus observed, slowly increased. The estimates vary, but I think I am fair in stating that it took from 15 to 20 minutes before the scow turned over. During that time the water on her starboard side was encroaching and creeping forward fur-, ther and further on her starboard rail until that rail was under water to a point more than two-thirds or three-quarters of its length forward.

7. As a result the inclination of the No. 32's deck towards the water got greater and greater until it had reached an angle of about 40 degrees.

8. That then the starboard side of her cargo, which, as above stated, had not been piled very high and had a steep angle of repose, had reached a position which was not far off from the perpendicular so far as the starboard slope of the pile was concerned, and that, then or about then, the cargo started to slide, with the result that it tore out ·a part of the scow's starboard rail, tipped her over, and went overboard itself.

9. That when she tipped the Scow No. 32 slid down into the water, which is thereabouts 32 feet deep, that she slid in towards the river and then shot back, jumping out of the water so that her bow, which had been swung towards Pier 22 by the result of the forces due to torsion of this irregular submersion, shot out of the water a considerable distance and landed upside down with her bow resting partly on the piles of the adjacent Pier 22 and partly on the Long Island Railroad Company's carfloat No. 10, which lay, as above stated, on the northerly side of Pier 22 and extended beyond the end of that pier.

The No. 32's approximate position after the accident, as I find it, is shown by the red pencil dotted lines on the Long Island Exhibit C, which I think shows the situation just after the accident with substantial accuracy. Although I am not sure that it is correct in putting the Moran No. 48 near the stern of the steamship Berk, that, if an error, is immaterial.

I find, therefore, that the foregoing is the story of the accident in so far as we need it for dealing with these cases.

VI. To my mind this story points one way only; that is, to the fact that either there was water—unsuspected either by the Port Fueling Corporation or by Hedger & Company—in the scow when she was delivered to be loaded alongside the Berk, or that a leak existed in her starboard after corner or near it either at·her stern or her side which had not been discovered by the casual inspection made by her owners when she was de-

livered under the charter and did not become operative until her submersion had gone further than it went by the partial loading of the previous day.

In any event, it seems to me that after she had reached a point of submersion with 375 tons of cargo on board, either due to her instability owing to the fact that she had water already in her or else to a leak which developed in her starboard after corner or thereabouts, as above suggested, she began slowly to list in the direction of her starboard corner.

The comparative sedateness of her gradual starboard sternwise submersion could be explained in my opinion by either one of the two alternatives I have suggested.

That she was improperly loaded would be the only other explanation of the accident.

Having heard all the witnesses, I am satisfied that the Cullen Fuel Company, Inc., has not made out that her cargo was improperly put on her. It seems to me that if the capsizing had been due to having her cargo improperly stowed, it would have been accompanied by entirely different phenomena to those observed. If it had been due to that cause, I doubt very much whether the scow would have shot across the intervening open water to the Long Island pier in the way it did, and have struck the railroad float and the pier in the way in which it struck them.

What I have said means that the claimants in the limitation of liability case have made out a case of liability on the part of the Cullen Fuel Company, Inc.; that the Port Fueling Corporation and W. E. Hedger & Company, Inc., are not liable to the Cullen Fuel Company, Inc., for damage to the scow, or to the Long Island Railroad Company for the damage it suffered; and that the Port Fueling Corporation is not liable to W. E. Hedger & Company, Inc., for the loss of the cargo.

■ VII. The next point with which I must deal is the right of the Cullen Fuel Company, Inc., to limit the liability so found against it.

I think such inspection of the Cullen No. 32 as was made before she was put on the charter and was lying light, drawing perhaps 18 inches to 2 feet of water, is not sufficient to satisfy the requirements of the situation.

It does not appear when she had been last caulked; the history of the scow was not shown with the frankness and in the detail that would be necessary to create a feeling of confidence in it in my mind.

The records of this particular scow perhaps may have been lost as is claimed during the moving of her owner from one office to another, but her owner's officers knew very well where all her repairs had been made, and they did not call any one from the repair yards to testify in regard to her.

Apparently a report by the master of the scow of a leak found was the only basis of or the reason for any examination other than walking around inside the scow when she was light to see whether there was any leak in her bottom and whether her beams were intact.

In other words, the Cullen Fuel Company, Inc., was indulging in a procedure which may·perhaps be conveniently called a hearsay inspection.

Captain Gardner, a surveyor, examined the scow whilst she was practically in the position in which she lay just after the accident occurred, and also saw her in dry dock and there made an ex post facto examination. The fact that he found good oakum in some started seams does not cover, of course, with any particularity the place where I have found that the leak must have developed—if indeed any examination after the scow was such a mangled wreck could be deemed to have established her seaworthiness in any regard when she went out on that charter. Certainly it could not have shown proper maintenance inspection by or in behalf of her owner.

The owner of the scow was here in port; the possibility of frequent observation of the scow by it is shown. The fact is that the scow was almost continually available for examination. In such a situation I think that her owners cannot be deemed entitled to have maintained the burden of proof to limit its liability on the facts as shown here.

■ The cause of the damage I have found to have been unseaworthiness due to a leak which the owner ought to have discovered and would have discovered if it had made a proper inspection. Cf. In re Eastern Transportation Co. (D. C.) 37 F.(2d) 363-365; Sanbern v. Wright & Cobb Lighterage Co. (D. C.) 171 F. 449, 455.

We have thus the privity of the owner of the Cullen No. 32 with the cause of the disaster—the causal connection between the damage and the owner's personal fault which I think is necessary to preclude limitation of liability. Cf. El Sol & The Sac City (D. C.) 45 F.(2d) 852 (decided November 3, 1930); The Thessaloniki, 267 F. 67, 70 (C. C. A. 2).

VIII. As to the findings of fact and conclusions of law in this case, I refer counsel to my decision in El Sol & The Sac City (November 3, 1930), and to the order entered in those cases on November 20, 1930, for my views as to the method of dealing with the requirements of the new Supreme Court (Admiralty) Rule 46½ (28 USCA § 723) and the practice I purpose following if parties are unable to agree on findings of fact in accordance with any opinion which I render, or are unable to submit to me findings which are satisfactory to me.

The matter of the findings of fact and conclusions of law must be finally disposed of on or before Wednesday, December 3, 1930.

IX. When the findings of fact and conclusions of law are disposed of, appropriate decrees will have to be entered in pursuance of the foregoing opinion.

These will be as follows:

1. There will be an interlocutory decree denying to the Cullen Fuel Company, Inc., any limitation of liability, providing for costs in favor of the claimants and providing for a reference to a commissioner to assess the damages as against the Cullen Fuel Company, Inc., and also providing, of course, for the continuance of the injunctions against proceeding elsewhere than in the limitation petition.

2. There will also be a final decree dismissing the libel of the Cullen Fuel Company, Inc., against W. E. Hedger & Company, Inc., the Port Fueling Corporation impleaded, with costs to each respondent as against the Cullen Fuel Company, Inc.

3. There will be a final decree dismissing the libel of W. E. Hedger & Company, Inc., as against the Port Fueling Corporation, with costs. This libel is, of course, stayed as against the Cullen Fuel Company, Inc.

The libel of the Long Island Railroad Company is also stayed as against the Cullen Fuel Company, Inc., and it must seek its damages in the limitation proceeding. Its libel in so far as the impleaded respondents are concerned, that is, W. E. Hedger & Company, Inc., and Port Fueling Corporation, is dismissed with costs to these respondents, recoverable in the first instance against the Cullen Fuel Company, Inc., the petitioner which impleaded them, and secondarily only against the libelant.

The decrees may be settled on two days' notice.