## HOLLAND et al. v. PENNSYLVANIA R. CO.

### No. 29 of 1941.

District Court, E. D. Pennsylvania.

Sept. 23, 1942.

Otto Wolff, Jr., of Lewis, Wolff & Gourlay, of Philadelphia, Pa., for libelants.

Robert V. Massey, Jr., and H. Francis DeLone, of Barnes, Dechert, Price & Smith, and Richard R. Bongartz, all of Philadelphia, Pa., for respondent.

LEAHY, District Judge, Specially Assigned.

At 6:15 on the morning of July 11, 1940, the tug "Trenton" left her slip between Piers L and M, on the Jersey side of the Hudson River and proceeded across stream at half-speed, bound for Pier 29 on the Manhattan side; her course was shaped toward Pier 32, which was 225 yards above Pier 29. When near mid-channel, she stopped to permit the motor vessel "Seatrain New Jersey" to cross her bow and continue upstream. Shortly thereafter, the Trenton collided with the "Big Chief" which had also been proceeding upstream.

An unusual conflict in the testimony requires a careful analysis of the facts to assign responsibility for what appears, at first blush, to be an inexplicable accident

calling for the application of the doctrine of inscrutable fault and divided damages.

Certain facts may be assumed in connection with this collision either because they are admitted or because they are conclusively proved. The Big Chief was bound for Pier 4, Hoboken, New Jersey, on a voyage from Phillipsdale, Rhode Island. After rounding the Battery, the master of the Big Chief encountered the Seatrain New Jersey and commenced to follow her up the river about a quarter of a mile astern and at half-speed (six knots an hour). Meantime, two tugs were proceeding across the river from the Hoboken to the New York side. One was the Trenton with a loaded car-float in tow on her starboard; the other—200 feet further up the river and to the Trenton's port—was the Cleveland with a pile driver in tow. As the Seatrain New Jersey approached the tugs, they stopped to let her pass, and she cleared their bows by about 100 feet. With engines stopped, the Trenton and her car-float completely lost headway and, although headed at an angle upstream, she began drifting downstream with the tide. After the Seatrain New Jersey had passed, the tug Cleveland gave a two whistle signal, which was severally interpreted by the Trenton as indicating an intention to cross her bow and by the Big Chief as indicating an intention to cross hers. Shortly after this was given, the master of the Trenton put his engines full speed ahead and his rudder hard right. A minute later, the bow of the Big Chief crashed approximately head-on into the starboard side of the car-float, somewhat aft of its midships section—despite the fact that the engines of the Big Chief had been thrown full speed astern about one or two minutes before the collision. No signals were exchanged at any time between the Trenton and the Big Chief. On the morning of the collision, the weather was clear —visibility, three and a half miles. The wind was west at eleven miles an hour; a strong ebb tide was running at two knots an hour.

These, then, are the "master facts"[1] in the light of which I must examine the contentions of the parties.

Libellants' contention is simply that the Big Chief was the privileged vessel[2] with the right—in fact, the duty—to maintain her course and speed[3] and that she did so until the Trenton ran across her path and collision became inevitable. The Big Chief came into collision with the car-float on the latter's starboard side, apparently head on at a point between her third and fourth cleats. The fifth cleat was about in the midship section.

For respondent, the master of the Trenton testified that, immediately after he stopped his tug to let the Seatrain New Jersey pass, he looked down the river and saw the Big Chief "heading toward the stern of the car float." He allowed his tug to lose headway, and she drifted downstream with the ebb tide—stern first. Thereafter, on receiving the Cleveland's whistle signal, he left his wheel, leaned out the window on the starboard side of the pilot house, and saw the Big Chief about 200 feet away and "heading for the after end of my tow." Despite his efforts to escape, the collision followed about a minute later.

Respondent argues:

1. As a consequence of the downstream drift of the Trenton, the Big Chief became an overtaking vessel with the duty[4] to keep out of the way of the Trenton.

2. Even though the Big Chief was the privileged vessel under the starboard hand rule, she failed in her duty to maintain her course (to the stern of the Trenton and her car-float) by changing her course to her starboard and directly into the car-float.

3. The Big Chief could have avoided the collision by swinging hard to port around the stern of the car-float; but instead she veered from two to three points (22½° to 33¾°) starboard with the result that the bow of the Big Chief sedulously followed the Trenton's car-float which was attempting to lift her stern away from the Big Chief.

■ Fitzpatrick, the master of the Trenton, admitted that as he emerged from the slip on the Jersey side he observed both

[1] So termed by Judge Woolsey in The Cullen No. 32, D.C. 45 F.2d 859, 862.

[2] Under the "starboard hand rule" as pronounced in Article 19, 33 U.S.C.A. § 204, and Rule VII of the "Pilot Rules for Certain Inland Waters" (Ed. May 28, 1940).

[3] Under Article 21, 33 U.S.C.A. § 206, and Rule IX of the "Pilot Rules" op. cit.

[4] Under Articles 23, 24 and 27 of the Inland Rules of Navigation, 33 U.S.C.A. §§ 208, 209 and 212, and Rules VI, VII and IX of the "Pilot Rules" op. cit.

the Seatrain New Jersey and the Big Chief proceeding up the river on his starboard and that he understood it was his duty to keep out of their way. With this in mind, I cannot agree with the argument that the Trenton, as the burdened vessel obligated to keep out of the way, could transform herself into the privileged vessel simply by changing the relative positions of the vessels. Respondent's reliance on The Steel Inventor, 2 Cir., 43 F.2d 958, for this contention is unfounded.[5] This clearly remained a crossing situation, and the Big Chief remained the privileged vessel.

Once the master of the Trenton—who also served as lookout [6]—became aware of the presence of the Big Chief on his starboard, he had the duty of keeping clear of her. Even though he thought she was proceeding to his stern toward the Hoboken shore, he should have realized that judgments as to speed, distance, and direction are unreliable when made on the water—particularly when made from the angle which the Trenton had at that time assumed.[7] Indeed, his subsequent actions show that he did not believe that the Big Chief was going to clear his stern with ease, for, when he believed the Cleveland wanted to cross the Trenton's bow and had accordingly given him two short blasts of signal, the Trenton stopped her engines [8] but did not answer or honor the Cleveland's signal. On the contrary, Fitzpatrick again looked out the window of his pilot house to see if the Big Chief had passed, or would pass, sufficiently clear of his stern so that he could reverse "in case he [the Cleveland] did not make clear of me." I can find little, if any, justification for the Trenton's reliance on so narrow a margin of safety in her navigation.

It is significant that at this point, Captain Fitzpatrick, becoming alarmed, put his engines full speed ahead and his wheel full right, in an attempt to cross the Big Chief's bow and go around her. As a matter of fact, however, by so doing he placed his car-float directly across the course of the Big Chief, and the latter was unable to avoid collision.

It is uncontradicted that the Big Chief reversed her engines full speed astern about 200 feet from the place of collision. Libellant, it seems to me, cannot be held at fault for any failure to reverse more promptly.

■ There is the possibility that dual fault might be found in this case for the reason that the master of the Big Chief permitted his vessel, which was the more maneuverable of the two, to shift her course two points (22½°) to starboard just prior to collision, when, if he had made sharply to port, there is the possibility that he might have crossed under the stern of the car-float. I recognize that the Trenton's fault does not excuse the Big Chief from adopting every proper precaution required by the special circumstances of the case to prevent a collision. Nevertheless, I believe this was a situation such as was commented on by Judge Kaloner in The Gulfstar, D.C., 42 F.Supp. 440, at page 447, where he said: "Moreover, where the Gulfstar [The Trenton], the burdened vessel, had placed the Sun [The Big Chief] in danger by bad navigation, the navigators of the privileged vessel are not held to the exercise of perfect and impeccable conduct in their navigation; they are only held to the exercise of their best judgment, which may not necessarily turn out to have been the best course to pursue; and the failure to adopt the best policy in an absolute sense, under the circumstances such as these, when faced by

---

5 Without pausing to distinguish the Steel Inventor on its facts, it is clear the case does not support the proposition that a burdened vessel in a crossing situation can make herself a privileged vessel by simply placing herself across the path of the starboard vessel in such fashion that the latter will then be two points (22½°) or more abaft her beam.

6 While the evidence is silent on whether the Big Chief had a lookout, it is clear that the Trenton did not have a lookout. Liability might well be predicated simply upon the Trenton's failure to maintain a vigilant lookout in the busy waters of the New York harbor. The Ariadne, 13 Wall. 475, 80 U.S. 475, 20

L.Ed. 542; Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, 2 Cir., 238 F. 560.

7 "Under the most favorable circumstances it is impossible to measure distances on the water with accuracy, but in times of excitement there is very little reliance to be placed on the opinion of any one on this subject, and especially is this so when the condemnation of a boat may depend upon it." Thompson v. The Great Republic, 23 Wall. 20, 29, 90 U.S. 20, 23 L.Ed. 55.

8 After the Seatrain New Jersey had passed, the Trenton had started her engines half speed ahead but had not yet made any headway.

danger, does not charge them with negligence in navigation. Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651."

■ My conclusion is that the Trenton was at fault and that the Big Chief is not chargeable with fault. A decree may be submitted in conformity with this opinion. It may include a provision for a reference to a special commissioner to find damages if the parties cannot agree on the items of damages.

Findings of fact and conclusions of law are separately filed in conformity with Admiralty Rule 46½, 28 U.S.C.A. following section 723.