**MOVIBLE OFFSHORE, INC., Plaintiff-Appellee,**

v.

**The M/V WILKEN A. FALGOUT, her engines, tackle, etc., et al., Defendants-Appellees,**

**Gulf and South American Steamship Co., Inc., Defendant-Appellant.**

**No. 72–1979.**

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1973.

Alfred M. Farrell, Jr., New Orleans, La., for Gulf & South American Steamship Co., Inc.

John Poitevent, New Orleans, La., for Movible Offshore, Inc.

George B. Matthews, James H. Daigle, New Orleans, La., for The M/V Wilken A. Falgout.

Before RIVES, THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This admiralty case arises from a late night collision on the Mississippi River

below New Orleans in the proximity of Bolivar Point, Mile 22. The damage claims of all interested parties were presented in a single action filed in the United States District Court for the Eastern District of Louisiana. That court, sitting without a jury, entered findings of fact and conclusions of law and rendered a judgment disposing of all the damage claims.[1] Only one of the parties, Gulf & South American Steamship Company, Inc., appeals from that judgment. We find that its allegations of error are without legal merit and we affirm.

On the night of November 16, 1969 the M/V WILKEN A. FALGOUT, which is owned by W. A. Falgout & Sons Boat Rentals, Inc., was towing the unmanned steel barge MOVIBLE C.B. 7 down the river. The barge, which is owned by Movible Offshore, Inc., was laden with a four-pile offshore steel platform owned by Chevron Oil Company. Ascending the river was the S. S. GULF BANKER, which is owned by appellant, Gulf & South American Steamship Company, Inc. Due to circumstances more fully discussed *infra*, a collision occurred in which the barge MOVIBLE, C.B. 7, its cargo, and the S. S. GULF BANKER were damaged.

Chevron assigned its damage claim to Movible Offshore, Inc., which brought this action against all of the following: the M/V WILKEN A. FALGOUT, *in rem;* S. S. GULF BANKER, *in rem;* W. A. Falgout & Sons Boat Rentals, Inc.; Gulf & South American Steamship Company, Inc.; and named, John Doe, and Richard Roe insurance companies. Gulf & South American Steamship cross-claimed against the interest of the M/V WILKEN A. FALGOUT.

The decree entered below held in part:

"[T]he S. S. GULF BANKER and the M/V WILKEN A. FALGOUT were both to blame and mutually at fault for the collision . . .

" . . . Movible Offshore, Inc. . . . is entitled to recover its provable damages jointly severally and *in solido* against the S. S. GULF BANKER and the M/V WILKEN A. FALGOUT, *in rem;* and against Gulf & South American Steamship Co., Inc.; W. A. Falgout & Sons Boat Rentals, Inc.; and the Hartford Fire Insurance Company, *in personam.*

" . . . Gulf & South American Steamship Co., Inc. is entitled to recover one-half of its provable damages from the M/V WILKEN A. FALGOUT, in rem, and W. A. Falgout & Sons Boat Rentals, Inc. . . ."

Appellant, Gulf & South American Steamship Company, Inc., seeks to cast all legal blame for the accident on the M/V WILKEN A. FALGOUT and urges reversal on three separate grounds. First, it argues that the district court's findings of fact are both clearly erroneous and too ambiguous to support the judgment entered. Secondly, appellant argues that the trial court erred in several specific instances in applying the law to the facts. Finally, citing United Geophysical Co. v. Vela, 5 Cir. 1956, 231 F.2d 816, 822, appellant asks that we conclude, "The finding of negligence [on appellant's part] produces a result which leaves us with a feeling that an injustice has occurred, and, as such, being clearly erroneous . . . it must be set aside . . .".

## I. THE FINDINGS OF FACT

■ Immediately following the introduction of depositions and various documentary evidence and the taking of testimony from witnesses, the learned judge below announced his decision from the bench. We note at the outset that we can discern no impropriety in a trial judge's choosing to render his decision speedily. Modern commentators repeatedly voice vociferous complaints regarding delay in the administration of justice, and we are reluctant to criticize reasonable efforts to hasten the turning

---

1. Only a claim for recovery of attorneys' fees was reserved, but it is not before us on this appeal.

of the wheels of the law. Of course, we can conjure circumstances that would cause a prudent judge to postpone his decision until he has had greater time to study the case. But where, as here, the trial judge states that he has given the matter careful consideration and has diligently studied the law and all briefs submitted to him, choosing not to delay his decision may well be the more desirable course. Indeed, Judge Rubin stated that he saw no purpose to be served here by postponing judgment other than the entry of more polished findings that might

> "read better than these dictated remarks will read. . . . I am aware, having tried a few lawsuits myself, that sometimes it seems the judge is more learned if he waits longer and gives his opinion, but as I have said in a number of cases, as I here repeat, in a situation where the primary issue is a factual one, all I would do by waiting is give you a better literary effort."

Judge Rubin further felt that there was a danger in putting off until tomorrow that which he felt fully qualified to do today: "I have equally no doubt that [the decision] would then be colored not by what I really conclude [are] the facts but by a memory of facts that becomes distorted as I hear other cases and turn my attention to other problems." In any event, deciding *when* to render judgment is a matter resting all but exclusively within the sound discretion of the trial court. In the light of Judge Rubin's recitations of diligent consideration, we can detect not even a hint of an abuse of that discretion here.

Reproducing Judge Rubin's fact findings verbatim would serve little purpose. We deem it sufficient merely to summarize his detailed findings regarding the behavior of the M/V WILKEN A. FALGOUT [W.A.F.], the S.S. GULF BANKER [G.B.], and their respective crews:

> "The night of November 16, 1969 was clear. There was no fog on the river and there were no impediments to vision. The point at Bolivar Point is low lying and clear of obstructions to vision. Thus, as the W.A.F. and the G.B. approached the site of the collision, it was possible for both their navigators to see across the point and observe each other while the vessels were still two to three miles apart.

> "The navigator at the wheel of the W.A.F. was Captain R. A. Falgout. He had been on watch seventeen hours and ten minutes prior to the collision and had been at the wheel ten hours and forty minutes consecutively. The W.A.F.'s crew consisted of but two other men, neither of whom was serving as a lookout. The W.A.F. was not equipped with VHF radio and she was maintaining a speed of six to seven miles per hour.

> "The G.B. was making about sixteen miles per hour as she proceeded up the river at full speed. She was being navigated by an experienced river pilot, Leonard C. Diket, and was equipped with both VHF radio and radar.

> "Bolivar Point is a turn to port for vessels descending the river and the 'point-bend custom' is in effect for this area of the river. A descending vessel would thus customarily favor the bend and the right descending bank. An ascending vessel would ordinarily run the point and favor the left descending bank. Vessels meeting in proximity to Bolivar Point would therefore pass port to port unless some other type of passing had been arranged by signal between the vessels. The proper whistle signal for a port to port passing is one blast and the signal for starboard to starboard passing is two blasts.

> "As the vessels approached the point, the W.A.F. was favoring the *left* descending bank. After the pilot aboard the G.B. first noticed the descending tow and studied her position by radar, he attempted to raise the W.A.F. on the VHF radio. Receiving

no response the G.B. reduced her speed from full ahead to half ahead but proceeded on her course.

"Captain Diket was uncertain of the W.A.F.'s course but assumed that she would continue hugging the left descending bank. After the G.B. had begun her approach to the point by turning to port, she gave the first signal—a two-blast whistle for starboard to starboard passing. The W.A.F. responded with an illicit one-blast cross signal, which signalled an intent to pass port to port. The G.B. immediately sounded the danger signal and went to emergency full astern. At that point, however, there was nothing either vessel could do safely that would have averted the collision that ensued.

"The actions of both vessels contributed to the causation of the collision. Both acted negligently."

As a matter of factual conclusion in the trial court, the W.A.F. breached several navigational rules and standards and was, without a doubt, negligent and a cause of the collision. Indeed, there is no serious dispute that the W.A.F. is liable. The only question is whether the G.B. must share the blame. But also as a matter of factual conclusion in the trial court, the G.B. was negligent and at fault. The G.B.'s principal error was her failure to signal earlier than she did. After sighting the W.A.F. and concluding that her course was uncertain, the pilot on the G.B. waited some time before sounding the first signal. The G.B. could have and should have appreciated the passing problem before she did, and she could have and should have taken action before she did to avert what happened:

"Captain Diket knew before he sounded a signal that he was meeting a tow, while he didn't appreciate the fact that he first saw its lights, he knew before he sounded the signal it was a tow on a hawser; he was an experienced pilot, this should have meant something to him; he was in a big vessel, ocean-going vessel, because the lights towered above the other vessel, he should have known that he created a hazard, but he chose, for reasons that I think are part of the human instinct so commonly displayed, to persist on his course, although he did slow his speed to half speed, await some signal, and in effect commit himself to conduct until the time when it became too late to avoid what happened."

More precisely, Judge Rubin explicitly found, "Captain Diket should have given the signal before he did. I don't really know whether Captain Diket should have given the starboard passing signal earlier or whether he should have concluded he was in doubt and given the danger signal, but he should have given some signal earlier."

■■ When challenged, findings of fact in admiralty cases are to be measured by the "clearly erroneous" standard. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)." Hess Shipping Corp. v. S.S. Charles Lykes, 5 Cir. 1969, 417 F.2d 346, 349, aff'd en banc, 5 Cir., 424 F.2d 633, cert. denied, 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 91. The question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did. The reviewing court should upset a finding only when it "is convinced on the whole record that the finding does not reflect the truth and right of the case." Wright, Federal Courts § 96, at 432.

■ The clearly erroneous test can never be applied with cybernetic certainty. Typically, we can but study the entire record to see whether the findings are clearly not supported by the evidence

or whether they clearly consist of illogical or improper inferences—in short, we look to see whether they fail to reflect "the truth and right of the case." This is not such a case. We have studied the instant record, and we find ample support in the evidence adduced and the logical inferences that can be drawn therefrom to justify Judge Rubin's findings. We reject the suggestion that these fact findings were "clearly erroneous."

■■ Appellant further urges, however, that crucial areas of Judge Rubin's oral findings are too ambiguous and uncertain to support the finding of liability against appellant. The principal concern seems to be with use of such words as "probably" and "perhaps". This argument also must fail. We do not read Judge Rubin's findings as revealing any lack of certainty. Rather, we think the "ambiguities" merely evidence a cautious mannerism of speech. Furthermore, it must be remembered that findings do not reach an appellate court in a vacuum. They come to us clothed in the context of the entire record, including the judgment rendered. If the entire cloth is tightly woven, we are not free to discard individual threads:

"While it is true that this court is not at liberty to refer to the opinion for the purpose of eking out, controlling or modifying the scope of the findings, the rule is not absolute and does not preclude reference to the opinion for all purposes whatsoever. It is well established that in case of ambiguity, extrinsic aid may be sought in order to settle the meaning of a statute or contract. We see no reason why the principle of that rule does not permit reference to the opinion of the court in order to clarify the meaning of a finding otherwise in doubt. The government suggests that in such case the proper course is to remand the case to the [lower court] in order that the court may supplement and clarify the findings and, if necessary, take additional evidence to that end. Of course, that sometimes has been done;

but where, as here, the finding, the pleadings and the opinion of the court, *taken together*, clearly show [the resolution of the fact issue], it is unnecessary to follow that procedure."

American Propeller & Manufacturing Co. v. United States, 1937, 300 U.S. 475, 479–480, 57 S.Ct. 521, 81 L.Ed. 751, 754–755 (emphasis added). *See also* Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407.

We here conclude that in the light of Judge Rubin's judgment, there are no ambiguities or uncertainties in his findings of fact that would prevent our deciding the case without a remand for clarification and expansion of those findings. The findings, the pleadings, and the opinion of the court, taken together, clearly show the certain resolution of every fact issue, and appellant's point must fail.

## II. THE APPLICATION OF THE LAW

Appellant casts its attack on the conclusions of law and on the judgment entered below in several different forms. Separating its efforts to re-argue the facts, which we dispose of *supra*, appellant's arguments purely on the applicable law basically boil down to this: Did the trial court err (1) in finding that the G.B. was negligent and therefore liable on the facts found, and (2) in refusing to exonerate the G.B. under the "major-minor principle" of The City of New York, 1893, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84. We affirm both holdings.

Although the question of whether given behavior is sufficiently improper to constitute negligence is frequently reviewed on appeal, the question of whether a party is at fault in causing or contributing to the causation of some calamity is largely one of fact. It is the standards of behavior that are set by law—whether behavior meets those standards is a question of fact, measured on appeal by the clearly erroneous

standard. *See* McAllister v. United States, *supra.* Importantly, where the standard set by law is that of the famous "ordinary, reasonable, and prudent man in the same or similar circumstances," whether the behavior can be called "negligence" rests with the trier of facts. This is to a large extent, just such a case.

It is the duty of the trier of facts to weigh all the conflicting evidence and inferences and to determine which actions contributed to the event in issue and which actions failed to meet the appropriate behavioral standards. *See, e. g.,* G. B. Zigler Co. v. Barker Barge Line, 5 Cir. 1948, 167 F.2d 676. Here, Judge Rubin found the following:

*"Conclusions of Law:*

"I think the circumstances of the case and good seamanship required that both Captain Falgout and Captain Dikert give signals before they did. I think each of them was negligent, however, in slightly different ways in causing the accident to happen.

"I think the up-bound GULF BANKER should have certainly signaled before she did. I think she should have reduced speed before she did. I think she had an adequate notice that there was some problem of passing and should have perhaps given a danger signal before she did.

"I think the situation likely was one that called for the application of rule 3 of the inland navigation rules, 33 U.S.Code, Section 203.

"  .   .   .   .

"In assessing contributory fault on the part of the GULF BANKER, I do not think I am dealing with a situation of seeking for minor errors of navigation in order to cast the vessel.

"Of course, this is a matter, I take it, really of judgment and not one that deals with having dogmatic rules, and I am well aware that the jurisprudence makes clear, as indeed it should, that the Court ought not, as the cases

put it, to search microscopically for flaws in the vessel's navigation.

"It sems to me that with respect to the GULF BANKER we have an experienced pilot who knew or should have known at the instant he saw the other vessel and had doubt as to its course, that if he had doubt it might not be doing what was customary. Now, he was bound to know the point-bend custom. He said he did. And he was bound to know, as an experienced navigator, of it. He should have known shortly after he sighted the lights or almost at the moment he did that what was coming down was a tow because of the difference in elevation of the lights, the difference in their scope and size between the tug and an ocean-going vessel. Shortly after that he was able to appreciate the fact that it was not only a tug escorting barges, but it was a tug on a hawser and he should have appreciated the fact that it would have some problems that a more responsive vessel would not have.

"I think he was bound to take into account in framing his own course.
"  .   .   .   .

"I think the situation, if I may take an analogy that may be inept, [is like that where] an automobile is on the road at night without headlights; it's violating the statute; it's negligent; but if the other fellow is able to see the automobile and appreciate the situation, then he ought to do something about it. He is not privileged to say, 'Well, there is that fool tug going down the river on a hawser, without a radio, won't answer signals, I don't know what she will do, ought to go to starboard.'

"I really think that greater caution should have been indicated to an experienced pilot immediately after his first sighting, and his area of fault lies in what he did between first sighting the W. A. F. and the time when he sounded the danger signal; after that I think he did all that any-

one could have done, but it was then too late."

Refined to its essence, Judge Rubin's conclusion was that the G.B. "likely" failed to comply with at least one of the Inland Rules; the G.B. was negligent in that it failed to comply with the standard of behavior demanded of vessels that find themselves in similar circumstances; that negligence contributed to the causation of the collision; hence, the G.B. should be held liable and the extent of liability should be measured by the rule of divided damages. Finally, Judge Rubin concluded that because the relative faults of the G.B. and the W.A.F. were not sufficiently disparate and because the G.B.'s negligence was *a* contributory cause, the major-minor principle does not exonerate the G.B. We agree that all of this is a correct application of the law to the facts.

■ We find that even without a specific, demonstrable violation of the Rules, liability can be imposed where negligence is found. *See, e.g.,* The Oregon, 1895, 158 U.S. 186, 201, 15 S.Ct. 804, 810, 39 L.Ed. 943, 950; United States v. Woodbury, 1 Cir. 1949, 175 F. 2d 854. *See also* Gilmore & Black, The Law of Admiralty 398–99, 419–22. We hold that where one vessel, although acting in substantial compliance with the appropriate navigational rules, appreciates or should appreciate that an impending problem or risk of collision exists yet *negligently* fails to act to avert it, if she may safely do so, she may be held liable. It is enough that the vessel sought to be charged had at its disposal safe means to avoid the collision and *negligently* failed to do so. In re M/V Fay Blackman, 5 Cir. 1971, 437 F.2d 542; United States v. M/V Wuerttemberg, 4 Cir. 1964, 330 F.2d 498.

Although Judge Learned Hand long ago stated that a navigator is not "called upon to divine the purpose of a meeting vessel, and at his peril to anticipate where she will be in accordance with her undisclosed purposes," The Hallgrim, 2 Cir. 1927, 20 F.2d 720, 721,

Judge Hand later said, "[I]t must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid." Ocean S.S. Co. v. United States, 2 Cir. 1930, 38 F.2d 782, 784. As Judge Rubin analogized below, an automobile driver who is obeying every statutory rule of the road is not free, upon sighting another driver whose course is uncertain, blithely to ignore the other's presence. Rather, as soon as the first driver should recognize that a risk of collision is imminent, he is required by operation of law to take whatever safe measures are at his disposal to avoid the calamity. Although the G.B. did not blithely ignore the W.A.F.'s presence, she was found to have taken insufficient measures to avoid what should have been, and what was, recognized to be a potential passing problem.

Having found the necessary factual basis, Judge Rubin properly held that the G.B.'s behavior was negligent and that because her negligence was only a contributory cause of the collision, the rule of divided damages applied. The Catharine v. Dickinson, 1855, 58 U.S. [17 How.] 170, 15 L.Ed. 233.

■ Appellant argues, however, that even if it can be charged with negligence, it should be exonerated from liability under the major-minor principle of The City of New York, 1893, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84. We cannot agree. This Court has defined the major-minor principle as follows:

> "[W]here the active fault of one vessel so flagrantly and heavily outweighs the passive faults of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely. The Great Republic, [1874], 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55 . . .".

The Queenston Heights, 5 Cir. 1955, 220 F.2d 120 (the exonerated vessel only "committed a technical fault *not* shown to have contributed to the collision . . .").

Contributory causation was found here, and we hold that that finding was

not clearly erroneous. Finally, Judge Rubin found that the extent of comparative fault in the instant case foreclosed application of the major-minor principle. In this regard, we find the court's opinion in Tide Water Associated Oil Co. v. The Syosset, 3 Cir. 1953, 203 F.2d 264, very instructive. One vessel, the Tycol, was guilty of a "litany" of improper acts and omissions. The Syosset, when confronted with this "wildly erratic navigation," failed to signal immediately that she did not understand the Tycol's course. Holding the non-signalling Syosset to the half-damages standard, the Third Circuit said.

> "Nor is the major-minor fault rule of any help to the Syosset. It is true that, were we free to apportion damages according to the degree of fault as is done by those countries which have adopted the Brussels Collision Convention of 1910, we would probably agree that a 50-50 division of damages here would be unjust. But even then we certainly could not say that the Tycol should bear 100% of the damages. The discussion above shows that the Syosset's failure to sound the danger signal *immediately*, when in doubt as to the Tycol's course or intention, had more than a minor part to play in causing the collision. Therefore, under the rule administered in American admiralty, she must bear half the damages."

203 F.2d at 268–269. On the instant fact findings, the G.B. too must bear half the damages.

### III.

Finally, in light of all that we have already said, we are in agreement that the finding of negligence on the part of the S.S. GULF BANKER does *not* produce "a result which leaves us with a feeling that an injustice has occurred, and, as such, being clearly erroneous . . . must be set aside." *See* United Geophysical Co. v. Vela, 5 Cir. 1956, 231 F.2d 816, 822.

At no judicial echelon is a court endowed with that perfect omniscience or prescience that an admiralty collision such as the one at bar would call for if absolutism in determining causation were the standard. Suffice it to say that the judicious analysis of the court below evidences such knowledgeable and conscientious intelligence that our appellate radar can detect no legal fallibility. The case is in all aspects affirmed.

Affirmed.