481 F.2d 366
 Fed. Sec. L. Rep. P 94,032
Edward J. JAPHE, Plaintiff-Appellant,
v.
A-T-O INC., formerly "Automatic" Sprinkler Corporation of
America, Defendant-Third Party Plaintiff-Appellee,
v.
Albert E. AMOS et al., Third Party Defendants.
 No. 72-3211.
 United States Court of Appeals,
Fifth Circuit.
 June 25, 1973.
 
 Eugene T. Branch, Earle B. May, Jr., Atlanta, Ga., for plaintiff-appellant.
 Richard Sinkfield, C. B. Rogers, Atlanta, Ga., for A-T-O.
 Ronald L. Reid, Atlanta, Ga., for Amos and others.
 Before TUTTLE, THORNBERRY and DYER, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 Japhe sued for damages for violation of Sec. 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in connection with the acquisition by A-T-O, Inc., of the outstanding stock of Advance Industrial Security, Inc., owned by Japhe, or for reformation of the purchase and sale agreement on the grounds of mutual mistake. The jury found for A-T-O on the securities count and the district court denied Japhe's claims for equitable relief. From the final judgment entered for A-T-O on both counts Japhe appeals. We affirm.
 
 
 2
 In limine it is important to point out that Japhe does not assert on appeal that the evidence submitted to the jury was insufficient to support the verdict. His points on appeal may be fairly stated as follows: with respect to the Securities Exchange Act count, the district court erred in giving certain instructions to the jury and it erred in excluding evidence offered by Japhe; with respect to the equitable relief sought, the findings of fact by the district court were clearly erroneous.
 
 
 3
 Japhe was the sole stockholder, president, and executive officer of Advance Industrial Security, a corporation engaged in the business of providing security guard service and security systems for large companies. Negotiations to merge Advance with A-T-O (formerly Automatic Sprinkler Corporation of America) were begun in the late spring of 1967. A-T-O, while perhaps not technically a conglomerate, had acquired a number of companies engaged in the production and sale of allied products and during this time was continuing to do so.
 
 
 4
 On May 24, 1967, a specific proposal was made by A-T-O to Japhe for an exchange of stock, the continuation of Advance as a wholly owned subsidiary of A-T-O, and the employment of Japhe as president of the subsidiary for a five-year term. Japhe was informed that any information he desired concerning A-T-O would be made available to him. Japhe was given the annual reports of A-T-O and he had studied the published materials concerning it. A-T-O agreed to bear the expense of an independent legal advisor and a financial advisor, to be chosen by Japhe, to evaluate the proposal and to make an analysis of A-T-O for him. Accordingly, Japhe selected and employed a New York securities concern, New York Securities Co., Inc., (Slade), and retained the New York law firm of Dunnington, Bartholow & Miller (Saunders), to be paid $20,000 and $10,000 respectively. A-T-O was informed of the arrangement, agreed to, and did pay the fees for Japhe. Japhe met with his advisors in New York and Cleveland on subsequent occasions.
 
 
 5
 Japhe's financial advisors informed him that A-T-O's stock was overpriced, 30 to 50 times earnings; that it was not recession tested, and was not a surething in the fickle stock market; that the underlying components of A-T-O did not deserve a very high price-earnings ratio; that they were not convinced that the management capabilities were exceptional or outstanding; that the stock was volatile, and that there was a possibility for a big swing in the market price. Nevertheless, they recommended the deal, principally because of the proposed 1969 payout formula, with which we shall later concern ourselves.
 
 
 6
 Negotiations continued between the parties, their advisors, and attorneys. On July 14, 1967, Japhe sent A-T-O a letter of intent which was accepted by it. This was followed by drafts of a proposed agreement in August and September. The transaction was finally closed on November 13, 1967.
 
 
 7
 The provision of the agreement critical to this action was that Japhe, in return for his stock in Advance, was to receive immediately, as an initial payment, a number of A-T-O shares equal to fifteen times the after-tax earnings of Advance for fiscal 1966 (which amounted to 13,760 shares of A-T-O based upon $38,000 earnings). The agreement further provided for a payout formula as follows: at the end of Advance's 1968-1969 fiscal year (April 30, 1969), Japhe would receive such additional A-T-O shares, if any, as would be required to equal the difference between fifteen times Advance's fiscal year earnings and the number of shares of A-T-O already received by Japhe, provided, however, that the additional number of shares would not exceed one hundred thousand.
 
 
 8
 While there was much discussion between the parties about making the merger tax free and about the necessity under the regulations of the Internal Revenue that the total number of shares received by Japhe should not exceed double the number of shares initially issued, Japhe and his advisors decided upon the 100,000 share ceiling because it would be "so far out in left field that it just would never have any bearing whatever on this." Furthermore, a separate agreement was executed at the time of closing that provided, inter alia, that if Japhe received more shares of A-T-O on the payout formula than he had initially received, A-T-O would free sufficient shares from the resale restriction so that Japhe could sell them to pay the tax.
 
 
 9
 At the time of closing, November 13, 1967, A-T-O stock was selling at $45,00 per share. Between then and the formula payout date, April 26, 1969 (advanced by agreement of the parties from April 30, 1969), A-T-O stock rose and fell and was finally calculated at $19.33 per share for payout purposes. When translated into A-T-O shares, this would have required the transfer from A-T-O to Japhe of 198,726 shares but for the ceiling limitation in the contract of 100,000 shares. In May of 1969, A-T-O tendered 100,000 shares to Japhe who refused the tender and brought this action for reformation of the agreement to remove the 100,000 share ceiling and thus obtain an additional 98,726 shares, or in the alternative for damages for alleged violations of Sec. 10(b) and Rule 10b-5.
 
 
 10
 While the equitable and legal actions of Japhe were necessarily premised on different bases for recovery, i. e., mutual mistake requiring reformation vis-a-vis misrepresentation, concealment, and course of conduct violative of the Act and Rule, the evidence adduced to prove both alleged causes of action was identical. Japhe does not suggest, nor could he, that his action for damages should not have been submitted to the jury. He likewise does not and cannot contend that there was not substantial evidence to support the verdict against him (although he does assign error with respect to the charges given by the court which we will discuss later). Thus he finds himself in the anomalous position of complaining that on identical evidence the jury found against him but that the trial court's findings should have been in his favor.
 
 Claim for Equitable Relief
 
 11
 Succinctly stated, Japhe argues that the district court's findings of fact were clearly erroneous because the evidence demanded a judgment granting reformation of the agreement by eliminating the 100,000 share proviso by reason of the mutual mistake of the parties as to the current earnings, business conditions, financial condition, and immediate business prospects of A-T-O at the time of the insertion of the proviso and at the time of the execution of the agreement on November 13, 1967. Japhe contends that the A-T-O officials either did not know of the true current condition of the company, or that they knew but misrepresented and concealed from Japhe the facts which would have influenced his determination of the amount of the maximum share provision. Japhe further contends that the top management of A-T-O engaged in a course of conduct of deception, fraud, and market manipulation.
 
 
 12
 It is uncontradicted that the 100,000 share proviso was initiated by Japhe and his advisors. Nevertheless, Japhe argues that there was an erroneously shared assumption with respect to A-T-O's current condition or that the mistake was wrongfully induced by (1) misrepresentations made in mid-1967 that A-T-O was embarking upon its most profitable six month period and reports thereafter that goals were being met; (2) concealment of the internal operations which would have shown that earnings worsened beginning with June 1967; (3) an aggressive acquisition program to purchase profits through acquisitions needed to offset the difference in earnings in 1967 compared to those of 1966; (4) projections and predictions of profits for 1967 and 1968 which A-T-O knew were not obtainable but which were designed to increase the price of A-T-O stock so as to aid the acquisition program.
 
 
 13
 It would serve no useful purpose to relate the voluminous evidence adduced by each side pro and con concerning these issues. Suffice it to say that A-T-O hotly contested whether it was guilty of any wrongdoing or negligence and whether there was any mistake on its part with respect to the 100,000 share proviso.
 
 
 14
 The district court found, and Japhe concedes, that the 100,000 share provision was selected by Japhe; that the proviso language is clear; and that the parties knew the meaning of the language used. It also found that there was no misrepresentation of a material fact or concealment of a material fact which induced Japhe to enter into the agreement and no misrepresentation of a material fact which induced Japhe to select the 100,000 share figure. Japhe, assuming while not conceding this, nevertheless urges that A-T-O was negligently ignorant of its own internal financial and operation statements and that he is therefore entitled to reformation. This is, of course, denied by A-T-O. After a careful consideration of the record, we are unable to find any support for Japhe's position.
 
 
 15
 In short, it appears that the mistake made by Japhe was his failure to make as good a bargain as he expected, or his mistake was with respect to collateral matters to the contract-that is, the future earnings of Advance and the future value of A-T-O stock. Such a mistake does not give rise to the reformation of a contract under Ohio law which is applicable here.
 
 
 16
 A mistake, to be a ground for reformation must be material, that is, one which will substantially affect the rights and obligations of the parties to the instrument. Moreover, it must be a mistake in reducing a contract to writing, not a mere error in settling the terms of the contract by which a party has failed to make as good a bargain as he expected, nor a mistake with regard to a collateral matter.
 
 
 17
 47 Ohio Jur.2d, Reformation of Instruments Sec. 13, p. 136.
 
 
 18
 Japhe's argument that it was his intent to have the proviso binding for tax purposes but not binding for payout purposes is unpersuasive, especially in view of his testimony that he simply picked the 100,000 share figure from "so far out in left field that it just would never have any bearing whatever." This underscores that the "mistake" was not with respect to a failure of the agreement to correctly reflect the intent of the parties, but rather that Japhe failed to anticipate that a collateral matter would render the provision of the contract operative. An analogous situation was presented in General Motors Corp. v. Swan Carburetor Co., 6 Cir. 1937, 88 F.2d 876, 883, cert. denied, 302 U.S. 691, 58 S.Ct. 49, 82 L.Ed. 534, in which the court said: "where the parties deliberately contracted with reference to a future fact, uncertain in detail and realized somewhat differently from what the parties expected . . . [and] . . . [t]he writing accurately expressed the agreement, even if appellant was mistaken so far as the scope of the patent was concerned" no basis for reformation was shown.
 
 
 19
 Equally important, we agree with the district court that there is no clear and convincing evidence of a mistake on the part of A-T-O. It is hornbook law that a contract cannot be reformed on the basis of a mistake that is not mutual.
 
 
 20
 When the right to reform an instrument is based solely on a mistake, it is generally necessary that the mistake be mutual and that both parties understood the contract to be as the petition alleges it ought to have been and as in fact it was, except for the mistake. This is so whether the mistake is one of fact or of law; in either case the mistake must be mutual, not that of one of the parties alone and must be established by clear and convincing evidence.
 
 
 21
 47 Ohio Jur.2d, Reformation of Instruments Sec. 16, p. 140-41.
 
 
 22
 Finally, while paying lip service to the clearly erroneous test of Rule 52(a), Fed.R.Civ.P., on our review of the district court's fact findings, Japhe's briefs and arguments are predicated upon facts, inferences and conclusions that the trial court neither found nor was compelled to find. As we explained in Movible Offshore, Inc. v. M/V Wilken A. Falgout, 5 Cir. 1973, 471 F.2d 268, 271, "[t]he question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did. The reviewing court should upset a finding only when it 'is convinced on the whole record that the finding does not reflect the truth and right of the case.' Wright, Federal Courts Sec. 96, at 432." See Wolf v. Frank, 5 Cir. 1973, 477 F.2d 467.
 
 
 23
 We conclude that the district court's findings of fact are not clearly erroneous but, on the contrary, are supported by substantial evidence. By the same token we are left with the definite and firm conviction that a mistake was not committed. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.
 
 Exhibits Offered in Evidence by Japhe
 
 24
 Japhe complains that the district court improperly excluded certain exhibits. He offered a transcript of a speech made by the president of A-T-O at a New York securities analysts' meeting on November 17, 1967, (four days after the acquisition agreement was executed by Japhe and A-T-O).[1] Japhe contends that the speech contains misrepresentations, indicates concealments concerning A-T-O's earnings, and was evidence of a course of conduct of A-T-O between June of 1967 and the early part of 1968. In sustaining an objection to the exhibit the court noted that the speech contained many extraneous matters that were not material to any issues of the case. We agree. More importantly, however, there was an abundance of other evidence that fully exploited the contents of the speech. In fact, Japhe's counsel conceded that "we think the speech, of course, has been gone into at length."
 
 
 25
 It is manifest that the other four documents offered by Japhe[2] and to which an objection was sustained were properly excluded as hearsay and repetitive. Furthermore, the contents of each exhibit were fully covered by other evidence before the jury.[3] There can be no prejudice to a party by the exclusion of proffered evidence where "the full import of most, if not all, of that evidence got before the jury in some form before the trial was concluded." Curtis Publishing Co. v. Butts, 5 Cir. 1965, 351 F.2d 702, 716. Rule 61, Fed.R.Civ.P.
 
 Refusal to Charge As Requested by Japhe[4]
 
 26
 The purport of Japhe's requested charges 3, 4, and 5 was to have the jury consider the purpose, meaning, and intent of Congress in the enactment of the Act and the promulgation of Rule 10b-5. Counsel has cited us no authority, and we have found none, which would support his argument that the court was required to so instruct the jury. We entertain serious doubts that the requested charges would have been proper. As this Court recently said:
 
 
 27
 Considered alone, the sweeping language of Rule 10b-5 creates an almost completely undefined liability. All that the rule requires for its violation is that someone "do something bad" [Citation omitted], in connection with the purchase or sale of securities. Without further delineation, civil liability is formless, and the area of proscribed activity could become so great that the beneficial aspects of the rule would not warrant the proscription.
 
 
 28
 Herpich v. Wallace, 5 Cir. 1970, 430 F. 2d 792, 804.
 
 
 29
 In any event the court charged the jury in the express language of Rule 10b-5. This was sufficient.
 
 
 30
 Japhe next assigns error in the refusal of the court to give his requested charges 8A, 9, 10, and 11.
 
 
 31
 Japhe's charges 8A and 9 were requested to present the issues of misrepresentation, concealment, and course of conduct occurring after November 13, 1967, the date the agreement was signed. Requested charges 10 and 11 were framed to inform the jury that, if after November 13, 1967, A-T-O through fraudulent or deceptive acts or a course of business caused the value in its stock to drop, it would be liable and, in this connection, the jury could consider the public and private statements of the company's officers made after November 13, 1967.
 
 
 32
 Japhe argues that the failure to give these charges resulted in withdrawing from the jury the acts or representations of A-T-O subsequent to November 13, 1967; that the conduct and statements were so close in time to the closing date that they were material and relevant; and that, in any event, the contract was not completely performed until April 26, 1969. Furthermore, he argues, the court refused to charge on course of conduct. We find no merit to these contentions.
 
 
 33
 The district court very liberally permitted Japhe to introduce evidence of claimed misrepresentations, concealments and course of conduct subsequent to November 13, 1967. In his closing argument Japhe's counsel repeatedly referred to misrepresentations and concealments allegedly made by A-T-O after the closing date. The court specifically charged the jury to consider the misrepresentations and concealments that were outlined to them in counsel's presentations.
 
 
 34
 We think the charges given not only amply presented the issues including the alleged post-closing representations, but were probably more favorable to Japhe than he was entitled. It must be remembered that his basic claim was that either he had been induced by false statements or had acted in ignorance of concealed facts in selecting his ceiling of 100,000 shares or in entering into the agreement at all.
 
 
 35
 Instructions regarding the non-essentiality of specific intent to defraud and the sufficiency of a mere showing of lack of diligence, constructive fraud, or negligent conduct on the part of the defendant to establish liability were requested by Japhe in charges 12 and 12A. He contends that by refusing these instructions the court placed a heavier burden on him than required by law, i. e., that he must prove intentional fraud. Again we disagree.
 
 
 36
 The instructions to the jury given by the district court were either as requested by Japhe, or the charges as a whole were more favorable than the standards he requested. As charged, Japhe could have prevailed if the jury had found that A-T-O merely did some act which was injurious to or took unfair advantage of Japhe. Furthermore, if the jury had found that a fact was misstated and was material, albeit innocently made, it would have fallen within the ambit of the court's charge on fraud. We perceive no error in the charges as given or in refusing the charges tendered.
 
 
 37
 It is, of course, elementary that the charges given must be considered as a whole. As thus viewed, the charges sub judice adequately set forth the applicable law and the theories and contentions of the parties. It was not essential that they follow the language in the requests to charge. As we recently pointed out in Delancey v. Motichek Towing Service, Inc., 5 Cir. 1970, 427 F.2d 897, 902:
 
 
 38
 A litigant is entitled to have a trial judge advise the jury of his claims and theories of law, if they are supported by the evidence and brought to the attention of the court. Nehring v. Empress Lineas Maritimas Argentinas, 5 Cir. 1968, 401 F.2d 767; Marshall v. Isthmian Lines, Inc., 5 Cir. 1964, 334 F.2d 131; Oliveras v. United States Lines Co., 2 Cir. 1963, 318 F.2d 890. The court is not required to give instructions in the language and form a litigant's lawyer fancies. The court has "considerable latitude in the choice of language used to convey to the jury in a clear and correct fashion the applicable law". Kayo Oil Co. v. Sammons, 5 Cir., 1963, 321 F.2d 729, 730. See also Nowell v. Dick, 5 Cir. 1969, 413 F.2d 1204. If the instruction as given sufficiently covers the case so that a jury can intelligently determine the questions presented, the judgment will not be disturbed because further amplification is refused. United States v. Bayer, 1947, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 654; Ohio & Mass. Ry. v. McCarthy, 1878, 96 U.S. 258, 24 L.Ed. 693.
 
 
 39
 Charges Requested by A-T-O and Given by the Court
 
 
 40
 Japhe assigns error in the court's having given seven of the charges requested by A-T-O.[5] We have considered the charges separately[6] and find that each charge states correct principles of law properly adapted to the facts of the case. The charges are, in large measure, supported by SEC v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833; Myzel v. Fields, 8 Cir. 1967, 386 F.2d 718; Clement A. Evans & Co. v. McAlpine, 5 Cir. 1970, 434 F.2d 100; and Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792.
 
 
 41
 Convinced that Japhe had a full and fair trial before the court and jury on all issues raised by him and that the errors assigned by him are without merit, the judgment of the district court is
 
 
 42
 Affirmed.
 
 
 
 [1]
 Exhibit 47
 
 
 [2]
 Equity Research Associates Memo, November 24, 1967, Ex. 49; Memo, Feb. 15, 1968, Ex. 50; letter from Argus Research Corp. to A-T-O with Weekly Staff Report, November 22, 1967, Ex. 52; and Kidder and Peabody Report, dated sometimes subsequent to November 17, 1967, Ex. 53
 
 
 [3]
 Although Japhe assigned error in the exclusion of the Notice of Special Meeting of Stockholders of George J. Meyer Mfg. Co. and proxy statement, Feb. 12, 1968, Ex. 78, the record clearly discloses that the exhibit was admitted in evidence
 
 
 [4]
 The district court declined to give charges requested by Japhe numbered 3, 4, 5, 8A, 9, 10, 11, 12, and 12A. No useful purpose would be served in reproducing the charges here
 
 
 [5]
 The A-T-O requested charges are not identified in appellant's brief or in the appendix as specific numbered requests but are incorporated by reference as paragraphs 7 to 14 inclusive of the "Issues to be presented for review" section of the Agreement of Counsel concerning the contents of the appendix
 
 
 [6]
 The objection to the charge contained in paragraph 9 is so oblique that it is unintelligible. No objection was made to the charge contained in paragraph 11