**INLAND RIVER TOWING, INC. Plaintiff**

v.

**AMERICAN COMMERCIAL BARGE LINE COMPANY Defendant**

**and**

**Peavey Barge Lines Intervening Plaintiff**

**No. 496CV167–D–D.**

United States District Court, N.D. Mississippi, Greenville Division.

Sept. 13, 2000.

Joel J. Henderson, Henderson Dantone, P.A., Greenville, MS, for counterclaimant.

Ernest Lane, III, The Lane Law Firm, P.A., Greenville, MS, for intervenor.

Frank S. Thackston, Jr., Lake Tindall, LLP, Greenville, MS, for counterdefendant.

## OPINION

DAVIDSON, District Judge.

Inland River Towing, Inc. (Inland River), owner of the vessel M/V FLOYD GOODMAN (the GOODMAN), instituted this admiralty action against American Commercial Barge Line Company (ACBL), owner of the vessel M/V ROBERT GREENE (the GREENE), for damage sustained to the tow of the GOODMAN as a result of a collision between the GOODMAN and the GREENE. The collision occurred on May 6, 1995, as the two vessels attempted to pass one another at Randolph Bend, Mile 747–748, on the Lower Mississippi River. ACBL has counterclaimed for damage sustained by one of its barges and for damage to equipment locat-

ed onboard the GREENE's tow. Peavey Barge Lines (Peavey) has intervened in this action to assert a claim for damage to five of its barges that were in the tow of the GOODMAN.

The court has jurisdiction of this cause pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. A bench trial concerning the parties' respective liability for the collision was convened from August 14, 2000, through August 16, 2000.

Having carefully considered the testimony and exhibits presented at trial along with the parties' post-trial submissions, the court finds the Plaintiff, Inland River, to be seventy percent at fault for the May 6, 1995, collision and the Defendant, ACBL, to be thirty percent at fault.

Pursuant to Federal Rule of Civil Procedure 52(a), the court issues the following findings of fact and conclusions of law.

### A. Factual Background

On the evening of May 6, 1995, the vessels GOODMAN and GREENE were traveling northbound (upriver) and southbound (downriver), respectively, on the Mississippi River, in the vicinity of Memphis, Tennessee. The two highly experienced Captains piloting the two vessels that evening were Wayne Wilcox, aboard the GOODMAN, and Dan Phelps, aboard the GREENE. Both vessels were powered by engines rated at over six-thousand horsepower and pushed tows that were over one thousand feet in length and between one hundred forty and one hundred seventy five feet in width. Both vessels were making relatively uneventful trips on the river and had met and passed other vessels that evening without incident.

Sometime between 7:30 and 8:00 that evening, Captain Wilcox and Captain Phelps became aware of each other's presence; at that time their respective vessels were some three to five miles, approximately fifteen minutes, apart. Both Captain Wilcox and Captain Phelps attempted to reach each other by radio, in order to coordinate a passing agreement, but were unable to do so. Significantly, both vessels were running, and continued running, near the red buoy line.[1]

As the minutes passed and the vessels came ever closer to each other, both Captains assumed, but did not know because of the lack of radio contact, that the other would move to the center of the navigable channel for the passing. By the time the vessels were within one-half mile of each other, both pilots had recognized that a collision could occur and they took evasive action. Captain Wilcox undertook to navigate a course that would take the GOODMAN completely outside the navigable channel, beyond the red buoy line, and out of the path of the oncoming GREENE. Captain Phelps, for his part, started backing the GREENE in an attempt to slow down and avoid a collision. At this time, radio contact was finally established but it was too late for the vessels to safely pass each other.

Then, at approximately 8:10 p.m., the lead barge in the port string of the GREENE's tow struck the third barge out on the port string of the GOODMAN's tow, causing extensive damage to both vessels. On May 13, 1996, the Plaintiff filed the current action. Prior to trial, the parties stipulated that Inland River's damages total $7,097.95, ACBL's damages total $26,605.20 and Peavey's damages total

---

1. Vessels typically navigate the Mississippi River in defined river channels, the edges of which are marked by a series of red and black buoys. On May 6, 1995, the left descending side of the over two thousand foot wide navigable channel in this area was marked by a series of red buoys (the red buoy line).

$190,625.73, together with prejudgment interest at six percent per annum from May 6, 1995.

### B. Standard for Apportioning Fault in Admiralty Collision Cases

█ The Inland Navigational Rules, 33 U.S.C. §§ 2001—2038, govern the conduct of vessels navigating the Mississippi River. These Rules and common law principles of admiralty law require prudent seamanship and the exercise of due care. A finding that a vessel's Captain has violated these Rules or principles may constitute negligence and impose liability on the Captain's employer. *Weathers Towing, Inc. v. M/V HERMAN POTT*, 570 F.2d 1294 (5th Cir. 1978); *Miller v. Semet–Solvay Div., Allied Chem. Corp.*, 406 F.2d 1037, 1038 (4th Cir.1969).

█ A Captain's violation of one of the Inland Navigational Rules invokes a rule of law known as The *Pennsylvania* rule. The *Pennsylvania* rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, "the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); *see Transorient Navigators Co., S.A. v. M/S SOUTHWIND*, 714 F.2d 1358, 1369 (5th Cir.1983). If one party carries this burden, the burden of proof as to causation is then shifted to its opponent.

█ The *Pennsylvania* rule applies in this case because the court finds, as explained below, that both Captains violated one or more of the Inland Navigational Rules. The court further finds, however, that neither party has proven that their violations could not have been one of the causes of this collision. Accordingly, liability for the damage sustained in this maritime collision is to be allocated according to the degree of the parties' comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 410–11, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975); *Valley Towing Serv., Inc. v. S/S AMERICAN WHEAT*, 618 F.2d 341, 346 (5th Cir.1980).

### C. Discussion

█ Applicable to this case are Rules 2, 7, 8, 9, 14 and 34 of the Inland Navigational Rules. *See* 33 U.S.C. §§ 2002, 2007, 2008, 2009, 2014, 2034 (1986; Supp.2000).

Rule 2 of the Inland Navigational Rules, 33 U.S.C. § 2002, provides in pertinent part:

> Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

33 U.S.C. § 2002 (1986; Supp.2000); *see generally Movible Offshore, Inc. v. M/V WILKEN A. FALGOUT*, 471 F.2d 268, 274 (5th Cir.1973).

The court finds that both Captain Wilcox and Captain Phelps violated Rule 2 because, despite the fact that no radio contact had been established, both pilots continued navigating along the red buoy line on a collision course, so that by the time they had both perceived that a risk of collision existed, it was too late to avoid a collision. The court, therefore, faults both pilots for failing to navigate their respective vessel with due care under the circumstances existing on the evening of the collision, in violation of Rule 2 of the Inland Navigational Rules.

Rule 7 of the Inland Navigational Rules, 33 U.S.C. § 2007, provides that:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

\*    \*    \*    \*    \*    \*

(c) Assumptions [about whether risk of collision does or does not exist] shall not be made on the basis of scanty information, especially scanty radar information.

33 U.S.C. § 2207 (1986; Supp.2000).

Until the vessels were a half-mile apart and radio contact was finally established, Captain Phelps assumed that a starboard-to-starboard (two whistle) passing would take place. He assumed this because the GOODMAN, rather than appearing to wish to run the reds, seemed to be pointing in the wind; this would allow the wind to shape the GOODMAN in the bend as it approached the GREENE. Appearances aside, however, Captain Wilcox fully intended for the GOODMAN to run the reds and, until the two mile separation point, believed that a port-to-port (one whistle) passing would take place. Both Captains, in selecting the navigational course of their respective vessels, based solely upon unconfirmed assumptions about the navigational intentions of each other, violated Rule 7 and contributed to this collision's occurrence.

Rule 8 of the Inland Navigational Rules, 33 U.S.C. § 2008, provides in pertinent part:

(e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

33 U.S.C. § 2008 (1986; Supp.2000).

While Captain Phelps, in violation of Rule 7, assumed that Captain Wilcox was preparing for a two whistle passing, Captain Wilcox perceived, beginning at least at the two mile separation point, that Captain Phelps was running the reds and, therefore, setting up for a two whistle passing instead of a one whistle passing as Captain Wilcox desired. But Captain Wilcox did not take evasive action until the vessels were one mile apart and did not sound his distress signal until just before the collision, after Captain Phelps had already sounded his horn, flashed his light, and established radio contact.

Instead, once Captain Wilcox perceived that a risk of collision existed, he continued full ahead to starboard in an effort to leave the channel completely and avoid a collision. Rule 8 of The Inland Navigational Rules, however, prescribes a different course of action—namely, that a mariner slow or stop his vessel in order to better assess the situation. *See* 33 U.S.C. § 2008(e) (1986; Supp.2000). Captain Wilcox, however, admittedly made no effort to stop or slacken his speed and comply with Rule 8. As the northbound vessel, he could have stopped his vessel in a relatively short distance and in far less time than the southbound GREENE required. This would have allowed Captain Wilcox time to further assess the situation and take appropriate action, including sounding his horn or setting up for a one whistle passing.

The court does find, however, that both pilots, in continuing to navigate toward one another without a clear understanding of the intention of the other pilot, failed to comply with Rule 8. While the GOODMAN, being northbound at a slower speed, was the more maneuverable of the two vessels, the court finds both pilots at fault for failing to slow down or stop to assess the situation.

Rules 9 and 14(a) of the Inland Navigational Rules mandate that, when two vessels are meeting on reciprocal courses, with no passing agreement in place, both are directed to steer to starboard. The

court finds that Captain Phelps violated both of these Rules because he did not attempt to steer to starboard until he recognized the risk of collision. Rule 14(a), however, instructs pilots to steer to starboard any time two vessels are meeting on reciprocal courses with no passing agreement in place, and not only after the risk of collision is evident. *See* 33 U.S.C. 2014(a) (1986; Supp.2000). Captain Wilcox, on the other hand, did attempt to steer his vessel to starboard, albeit at full throttle.

Rules 9 and 14 further instruct that downbound vessels, here Captain Phelps aboard the GOODMAN, have the right-of-way over upbound vessels. *See* 33 U.S.C. §§ 2009(a)(ii), 2014(d) (1986; Supp.2000). Along with that right, however, comes the responsibility for proposing the manner and place of passage and initiating any necessary maneuvering signals. The court finds that Captain Phelps did not timely propose the manner and place of passage in a proper manner; this failure to act contributed to the collision's occurrence. Captain Wilcox, however, did not properly yield the right-of-way, even after it became obvious to him that the GOODMAN desired a two whistle passing.

Finally, Captain Wilcox violated Rule 34 of the Inland Navigational Rules, 33 U.S.C. § 2034, which provides in pertinent part:

> (d) When vessels in sight of one another are approaching each other or from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five (5) short and rapid blasts on the whistle . . .

33 U.S.C. § 2034 (1986; Supp.2000).

Captain Wilcox was admittedly the first to perceive that a risk of collision existed.

While the court faults Captain Phelps for not recognizing sooner that a risk of collision existed, had Captain Wilcox complied with Rule 34 and sounded his horn at the one mile distance, especially considering that no radio contact had yet been made, both pilots could have begun taking evasive action sooner than they did and a collision may have been avoided. Instead, Captain Wilcox did not sound his horn until just before the collision occurred. And, radio contact was not made until the vessels were one-half mile apart, and only then after Captain Phelps blew his danger horn and flashed his spotlight at the GOODMAN's pilothouse. It was too late by that time, however, for the radio to be of any assistance in negotiating a passing agreement, and a collision was practically unavoidable.

### D. Conclusion

In sum, the court finds that the Plaintiff is seventy percent liable for the collision and the Defendant is thirty percent liable. Specifically, the court finds that Captain Phelps, while tardy in recognizing that a risk of collision existed, took immediate and proper action to avoid a collision upon discovering a present risk of collision. Specifically, Captain Phelps backed his vessel, blew his danger signal, shined his light at Captain Wilcox, established radio contact and alerted his crew.

Captain Wilcox, on the other hand, while perceiving a risk of collision for at least a half-mile before Captain Phelps, did not blow his danger signal or shine his light at Captain Phelps, even though both actions are called for by Rule 34 of the Inland Navigational Rules and would have alerted Captain Phelps as to the danger of the situation at hand. Instead, Captain Wilcox did nothing but continue to steer to starboard full ahead. As such, the court finds

that Captain Wilcox's actions are the predominant cause of this collision. In addition, Captain Wilcox was negligent in not taking action sooner to avoid a collision, in violation of Rules 8 and 34 of the Inland Navigational Rules, and in continuing to run full speed ahead along the red buoy line after he recognized the existence of a risk of collision, rather than slackening his speed or stopping, as required by Rule 8.

Finally, the general rule in admiralty is that prejudgment interest should be awarded absent peculiar circumstances. *King Fisher Marine Serv., Inc. v. The NP SUNBONNET,* 724 F.2d 1181, 1187 (5th Cir.1984). Because no peculiar circumstances exist here, prejudgment interest shall be awarded at the rate of six percent per annum from the date of collision, May 6, 1995, to and including the date of this opinion.

A separate judgment in accordance with this opinion shall issue this day.

### JUDGMENT

After a bench trial and pursuant to an opinion issued this day, the court rules that

(1) the Plaintiff in this cause is seventy percent liable for the May 6, 1995, collision occurring between the vessels M/V FLOYD GOODMAN and M/V ROBERT GREENE;

(2) the Defendant in this cause is thirty percent liable for the May 6, 1995, collision occurring between the vessels M/V FLOYD GOODMAN and M/V ROBERT GREENE. Therefore,

(3) judgment is hereby rendered in favor of the Intervening Plaintiff Peavey Barge Lines and against the Plaintiff Inland River in the amount of $133,438.01, plus prejudgment interest at the rate of six percent per annum from May 6, 1995, to and including the date of this opinion;

(4) judgment is hereby rendered in favor of the Intervening Plaintiff Peavey Barge Lines and against the Defendant ACBL in the amount of $57,187.72, plus prejudgment interest at the rate of six percent per annum from May 6, 1995, to and including the date of this opinion;

(5) judgment is rendered in favor of the Defendant ACBL and against the Plaintiff Inland River in the amount of $18,623.64, plus prejudgment interest at the rate of six percent per annum from May 6, 1995, to and including the date of this opinion;

(6) judgment is hereby rendered in favor of the Plaintiff Inland River and against the Defendant ACBL in the amount of $2,129.39, plus prejudgment interest at the rate of six percent per annum from May 6, 1995, to and including the date of this opinion; and

(7) this case is CLOSED.